# AMERICAN ARBITRATION ASSOCIATION
## Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Re: 12 181 00446 01

    Maddy Petroleum Equipment, Inc.  (Claimant)
    and
    Success Systems, Inc.    (Respondent)

## AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated September 15, 2000, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, AWARD, as follows:

1. **Background of the Dispute**

   The Claimant, (herein referred to as "Maddy" or "Distributor") as a distributor for a number of manufacturers, sells and has sold for a number of years, various items (such as cash registers and other point of sale products). The Claimant primarily emphasized retail gas stations and convenience stores as its main market. Geographically the Claimant operated in Ohio and the surrounding area.

   The Respondent (herein referred to as "Success" or "Supplier") provides, installs and maintains back office systems, (computer software and associate equipment targeting gasoline and auto repair shops as well as convenience stores. While the Respondent claims to be the largest supplier of these products, there are a number of competitors. Each of the competitors uses different software and in general produces results which may emphasize different aspects of the business.

   The Claimant recognized that it would be desirable for him to carry a line of back office systems which it could offer to its market to supplement other products it distributed. The Respondent apparently concluded, that in view of the Claimant's business, the Claimant would be a desirable distributor for the Respondent's products in the Ohio territory.

   On October 3, 2000 the Parties entered into a Distribution Agreement. The Distributor (Claimant) was to solicit customers meeting the qualifications and criteria of the Supplier (Respondent) and have the Customer enter into a License Agreement with the Supplier with respect to the proposed installation and use of Licensed Products. The Distributor would then supply the Customer with the required software and hardware. Such items would be purchased by the Distributor from the Supplier at a discount and resold at a profit. The Supplier would then install the items and provide continuing support and maintenance as required.

   Claimant elected to utilize the "Platinum Program" which required an initial inventory purchase of $30,000 in order to obtain a 40% discount on products sold. This was modified to require a $15,000 payment when the contract became effective, (made on October 15, 2000), and starting on November 15, 2000 monthly payments of $2,500 until the total of $30,000 had been paid. Two payments of $2,500 each were made.

   Success entered into negotiations with at least two potential customers (both of whom had previously purchased from Maddy) and a Maddy representative accompanied the Success during some visits when the customers were being solicited. On learning that they would receive no compensation for any such assistance the Distributor, by a letter dated Feb. 28th 2001, informed the Supplier that "Due to various misrepresentations, unprofessional business practices and an inability by you to represent your product as promised…" the Distributor was giving, in accordance with paragraph 11 of the contract, 30 days notice of cancellation, demanding the immediate return of all "prepaid license fees".

1

Re: 12 181 00446 01
   Maddy Petroleum Equipment, Inc.   (Claimant)
   and
   Success Systems, Inc.   (Respondent)

---

The Respondent alleges that the failure of the Claimant to make the full $30,000 payment, failure to return the confidential materials and other actions were a breach of contract by the Claimant and a violation of Connecticut laws relating to Trade Secrets and Unfair Competition entitling the Respondent to an award..

In furtherance of the Agreement and to assist the Distributor in soliciting licensees, Respondent alleged that the Claimant was provided with confidential information and trade secrets including but not limited to copies of the software that was to be licensed, as well as client lists, pricing information, educational, training and administrative manuals, memoranda, notes, records, drawings, manuals, disks, and other documents and media owned by Respondent pertaining to the business.

2. **The Complaint**

Complainant filed a Demand For Arbitration on June 21, 2001 alleging that the Respondent interfered with Claimant's efforts to solicit customers for the Respondent's products by canceling meetings with prospective customers or sending representatives who arrived late and were unprepared.. In addition, Claimant alleged that Respondent used information about the Claimant's business which it obtained from the Claimant, in order to enter into the Distributor relationship. Thus for fraudulently inducing Complainant to enter into the Distributor Agreement, and interfering with the Complainant's activities and failure to provide the support and inventory necessary for Claimant to perform its obligations under the Agreement, the Complainant sought the return of the $20,000 initial payment, plus actual and compensatory damages and Attorney's fees.

3. **The Answer and Counterclaims**

Respondent entered a general denial of the claims set forth in the complaint and entered counterclaims alleging:

   A. That Respondent incurred damages due to Claimant's breach of contract in that Respondent failed to pay the last $10,000 of the initial inventory commitment payment and
   B. Claimant misappropriated trade secrets and other confidential materials, by failing to return them and failing to keep such materials in strict confidence. Respondent alleged that Complainant made use of the confidential material and trade secrets to unfairly compete with the Respondent, violating the Connecticut Uniform Trade Secrets Act ("CUTSA") and the Connecticut Unfair Trade Practices Act ("CUTPA").
   C. Respondent was entitled to damages, Attorney fees and punitive damages.

4. **The Contract**

The issues in this dispute primarily relate to the contract entered into between the parties and to the rights and obligations of the parties flowing from the contractual relationship.

Article 16 of the contract provided that "...any claim, controversy, or dispute arising between the parties with respect to this agreement....shall be submitted to and resolved by arbitration."

After three years the contract could be terminated by either party by giving thirty days notice however during the first ninety days the licenser could terminate the contract and all prepaid and unused fees would be returned to the Distributor.

The contract refers to "fees" but the initial obligation of the Distributor refers to "Inventory Commitment Payment" or "Initial Inventory Purchase". This amount was a minimum commitment

2

Re: 12 181 00446 01
Maddy Petroleum Equipment, Inc. (Claimant)
and
Success Systems, Inc.    (Respondent)

---

["sometimes considered a "good faith payment"] against which the Distributor could order products at a discount and resell at a market price with the difference being the Distributor's profit. There is no provision in the contract that would allow the Distributor to claim the return of any portion of this sum. (As a matter of fact there is no provision that would allow the Distributor to return any products for credit.) On the other hand there is a provision that refers to the return of prepaid and unused Fees under certain circumstances. Since termination did not occur within the initial ninety day period this clause did not become effective.

The obligation to remit the total initial payment is unconditional. While the Claimant may have believed that the payments were refundable and would not have entered into the contract if he knew they were not refundable such beliefs, even when based on oral representations which may have been made, do not modify the written document. The initial payment would have been made when the contract became effective but was modified to provide for monthly payments of $2,500 after a first payment of $15,000. A total of $20,000 out of the agreed $30,000 was paid.

The Claimant had the burden of proof concerning its allegations of intentional interference, failure to deliver inventory, fraudulently inducing Claimant to enter into the contract and other alleged conduct of the Respondent. Testimony was presented primarily concerning the conduct of the parties in dealing with potential Licensees, Englefield Oil, Black Gold and City Ice. In each case it was the belief of the Claimant that the Respondent would not permit the Claimant to share in the fees. The conclusion of the Claimant was not in error. The Respondent maintained that they were in contact with the potential licensees prior to the Claimant becoming a distributor and the Claimant's contributions were minimal. The contract did not provide for an exclusive territory for the Distributor. The contract did provided that if more than a single organization or individual claimed a fee, the determination of the Respondent as to the applicable division of the fee would be final and binding.

In addition to the demand that the Complainant should pay the remaining $10,000 of the initial fee, the main thrusts of the Respondent's counterclaims relate to confidential information and trade secrets and the Claimants entering into a distributorship agreement with CMI, a competitor of the Respondent, at about the same time as Claimant became a distributor for the Respondent.

Nothing in the contract prevented Claimant from representing other entities that might compete with the Respondent. It was clear from the evidence that the Claimant did in fact represent competing suppliers for other products that were handled by Claimant as distributor. Claimant' witness indicated that it would not have entered into the agreement if it was limited to representing only the Respondent. On the other hand the Respondent was under the impression that the Distributor would not handle products that compete with those of the Respondent and would Respondent's President stated that he would not appoint a distributor unless the distributor would not handle competing products.

Respondent referred to the contractual responsibility of the Claimant to use its "best efforts" to solicit End-Users on behalf of the Respondent. While a "Best Efforts" clause may be subject to various judicial interpretations it is clear that a "best efforts" clause is not the equivalent of a "non-compete" clause.

The burden of proving the counterclaims by a preponderance of the evidence rested with the Respondent. There is little doubt that the Claimant became privy to some confidential information of the Respondent during the relationship and became a distributor for a competitor of Success. The Respondent failed to prove that the Claimant disclosed or failed to maintain in confidence any such material. It was shown that Claimant attempted to sell a system to Englefield Oil but this was after The Respondent's system was no longer being considered. It should also be noted that neither Englefield nor City Ice purchased any system from the Respondent or the Claimant and therefore even if it could be proven that the Claimant interfered with the Respondents efforts to sell it can not be stated that except for the actions of the Claimant, the Respondent would have received the contract.

Re: 12 181 00446 01

Maddy Petroleum Equipment, Inc.   (Claimant)
and
Success Systems, Inc.        (Respondent)

---

For many years Claimant served the targeted market of the Respondent and in addition knew that RSI had sold similar systems to that market. Deciding to enter that market, the Claimant had the advantage of determining potential customers without reference to information provided to it by the Respondent. The mere fact that Claimant represented a competitor does not support the conclusion that confidential information was disclosed.

The Claimant was contractually obligated to return certain materials to the Respondent upon termination of the contract. Testimony indicated that upon termination the material then in possession of the Claimant was placed in a file and returned in April, 2001. While the contract did not specify a time limit for the return of the materials it did state that the material was to be returned upon request. In any event no damages were proven by a preponderance of he evidence based upon the retention of this material for the extended period.

Upon the return of the material the Claimant maintained that one of the disks containing confidential information was a copy of the original disk that was provided. The Claimant maintained that all material in their possession was returned. Respondent offered no proof that the missing disk or any other material was retained by the Claimant other than the fact that it was not returned according to the Respondent.. Conjecture and suppositions are not sufficient. Thus the burden of proof concerning retention, misuse or failing to keep confidential information confidential was not sustained by the Respondent.

The Respondent did not sustain the burden of proof relating to the Complainant's misappropriation, interference with, competition with or undermining business opportunities or contractual relations of the Respondent.

**Accordingly, I AWARD as follows:**

- A. This controversy and all the issues raised by the parties are subject to arbitration.
- B. Claimant shall take nothing on its claim.
- C. The Claimant is to pay to the Respondent $10,000 still due as part of the initial payment plus interest on any unpaid balance at 3% per annum from March 1, 2000 to date of payment or December 31, 2003, whichever occurs first. Interest at 10% per annum from January 1,2004 until paid.
- D. Respondent is to take nothing on the remaining counter claims.
- E. Actions of the Respondent did not so interfere with the actions of the Claimant as to amount to an interference with efforts to solicit customers for the Respondents products.
- F. Claimant did not sustain the burden of proof to show that Respondent utilized information about the Claimants business which it obtained from the Claimant, in order to enter into the Distributor relationship.
- G. Claimant did not carry the burden of proof that that Respondent interfered with Complainants activities, or failed to provide support and inventory necessary for Claimant to perform its obligations under the contract.
- H. The testimony of the Respondent's witness and the evidence failed to support any misappropriation or misuse of the Respondent's confidential information.
- I. No violation of CUTPA or CUTSA was proven
- J. Compensatory and punitive damages of the Claimant are denied.
- K. Compensatory and punitive damages of the Respondent are denied.
- L. The costs of the arbitration are to be divided equally between the parties; each being responsible for one half. Each party is to bear their own Attorney's fees.

Re: 12 181 00446 01
Maddy Petroleum Equipment, Inc. (Claimant)
and
Success Systems, Inc. (Respondent)

---

The administrative fees of the American Arbitration Association ("the Association") totaling $1500.00, and the compensation of the arbitrator totaling $3,600.00 shall be borne equally by the parties. Therefore, Respondent shall pay to Claimant the sum of $550.00, representing its share of amounts previously advanced to the Association. These amounts reflect all payments made to date.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

12-19-03
Date

Mr. Ernest Fanwick

I, Mr. Ernest Fanwick, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

12-19-03
Date

Mr. Ernest Fanwick

5



# Distributor Application

# &

# Distribution Agreement

*PLATINUM DISTRIBUTOR*

## Distributor Information:

| | |
|---|---|
| Corporate Name: Maddy Petroleum Equipment | Federal ID #: 31-1284761 |
| t\a or d/b/a: | Year Incorporated: 1985 |
| Mail Drop Address: 351-5 Lowery Ct. Groveport, OH 43125 | |
| Shipping Address: same | Telephone #: 614-836-9668 |
| E-mail Address: Denmad@AOL.COM | Fax #: 614-836-1713 |
| City: Groveport | State: OH    Zip: 43125 |

## Banking Institutions:

| | | |
|---|---|---|
| Bank Name: Huntington Nat'l Bank | | |
| Account # 01891306682 | ☒ Checking  ☐ Savings | |
| Telephone #: 614-645-0008 | Contact: Mark Ridgeway | |
| Address: 37 S. High St. | | |
| City: Canal Winchester | State: OH | Zip: 43110 |
| Bank Name: | | |
| Account # | ☐ Checking  ☐ Savings | |
| Telephone #: | Contact: | |
| Address: | | |
| City: | State: | Zip: |

## Trade References (over 12-month history)

| | | |
|---|---|---|
| Vendor Name: Husky Corp. | Tel #: ✓ | Terms Extended ☐Yes ☐No |
| Mail Drop Address: Lockbox 18763 | 800-325-3558 | Credit Line: $ |
| City: St. Louis | State: MO | Zip: 63178-8763 |
| Telephone #: 800-325-3558 | Contact: A/P | |
| Describe materials purchased: parts for gas pumps: hoses, nozzles, swivels | | |

| | |
|---|---|
| Vendor Name: EBW | Terms Extended ☐Yes ☐No |
| Mail Drop Address: PO Box 77000 | Credit Line: $ |
| City: Detroit  State: MI | Zip: 48777 |
| Telephone #: 800-475-3201  Contact: A/P | |
| Describe materials purchased: parts for gas pumps | |

| | |
|---|---|
| Vendor Name: Mid Valley | Terms Extended ☐Yes ☐No |
| Mail Drop Address: Location 00363 | Credit Line: $ |
| City: Cincinnati  State: OH | Zip: 45264-0363 |
| Telephone #: 800-848-0999  Contact: A/P | |
| Describe materials purchased: boards | |

## Personal Information - Owner/Principal

| | |
|---|---|
| Name: Dennis Maddy | % of Ownership: 100 |
| Mail Drop Address: 351-5 Lowery Ct. Groveport, OH 43125 | |
| Residential Address: | |
| City:  State:  Zip: | |
| Social Security #:  -  -    ☒ Owner  ☐ Rent | Years at Address: 15 |

Success Systems, Inc.    Page 3 Confidential Distributor Information    rev 3 3/99

## Business Survey

Number of unit sales expected in the next 12 month: __20__

Expected <u>retail</u> dollar value expected in the next 12 month: _____

Geographic Territory Desired (please list by zip code):

_____OHIO, WEST VIRGINIA, Western Pensylvania_____

Credit Line Requested: $ __20,000__

Expected hours per week dedicated to promoting Success Systems® products: __@ > 3 Salesmen__

Number of representatives who will be trained to promote Success Systems® products: __3__

Please check all POS terminal and/or dispensers which your firm represents:

| My firm is an authorized distributor for: | My firm is not formally authorized to distribute the following products, but we/I do distribute * the following: |
|---|---|
| ☒ Bennett | ☐ Bennett |
| ☐ CanMax | ☐ CanMax |
| ☐ Gilbarco | ☒ Gilbarco  YES |
| ☐ IBM | ☐ IBM |
| ☒ Schlumberger | ☐ Schlumberger |
| ☐ Radiant (Soft Sense) | ☒ Radiant |
| ☐ Tec | ☐ Tec |
| ☒ Tokheim | ☐ Tokheim |
| ☒ Verifone Ruby | ☐ Verifone Ruby |
| ☐ Sharp | ☐ Sharp |
| ☐ DataSym | ☐ DataSym |
| ☐ DataCap | ☐ DataCap |
| ☐ Panasonic | ☐ Panasonic |
| ☐ Sanyo | ☐ Sanyo |
| ☐ Others (please list) SUNTRONICS | ☐ Others (please list) |
| BRAND | CONCENTRATION |
| ☒ Amoco ☒ BP ☒ Citgo ☒ Exxon ☒ Mobil | ☐ Chevron ☐ Philips 76 ☒ Marathon |
| ☐ Conoco ☐ Getty ☐ Fina ☒ Shell ☐ Star | ☐ Texaco ☒ Sunoco ☐ Diamond Shammrock |
| * The distributor / manufacturer my firm purchases our POS terminals from is: | |

**Business & Credit Terms**

## SALES DISTRIBUTOR AGREEMENT

Success Systems, Inc., a Connecticut corporation with offices at Post Office Box 2457, 45 Church Street Suite 106 Street, Stamford, CT 06906, ("Licenser"), **and Maddy Petroleum Equipment, Inc** located at 351-5 Lowery Ct. Groveport, OH 43125. The undersigned ("Distributor"), in consideration of their obligations in this Agreement and intending to be legally bound, agree as follows:

1. **Definitions.** For purposes of this Agreement:

    a. "End-User" shall mean, as to each Licensed Product, an end-user customer that meets the qualifications and criteria applicable to such offering established by Licenser for solicitation by Licenser's Distributors from time to time.

    b. "License Agreement" shall mean the contract in the form, and containing the terms and conditions (including price and payment terms) established by Licenser from time to time for the license of a Licensed Product to an End-User.

    c. A License Agreement shall be "obtained from an End-User" if, and only if, (1) Distributor has directly solicited the End-User while engaged as an independent contractor of Licenser here under; (2) the terms and circumstances of the License Agreement comply with Licenser's rules and procedures; (3) the License Agreement has been executed by an authorized representative of the End-User and forwarded to Licenser's designated contract administrator; (4) Distributor is the direct procuring cause for such End-User's agreement to obtain the Licensed Products; and (5) Distributor has collected and remitted to Licenser's designated accounts administrator all initial license fees due for the Licensed Products.

    d. "Licensed Products" shall mean the computer software products offered by Licenser through its Distributors in the United States, as set forth in Licenser's current Product Listing attached hereto as Exhibit A.

2. **Appointment.** Subject to the terms of this Agreement, Licenser engages Distributor to solicit End-Users to enter into License Agreements with Licenser for its Licensed Products. Distributor may solicit End-Users only with respect to their proposed installation and use of the Licensed Products in the territory set forth in Exhibit B. Licenser reserves the right, as to any or all of the Licensed Products, to change the qualifications and criteria for End-Users, the terms and conditions of its License Agreement, and the Licensed Products set forth in its Product Listing at any time. Distributor acknowledges that this Agreement does not confer on Distributor exclusive rights in any territory. Distributor represents and warrants to Licenser that it has the authority to enter into this Agreement and to perform its terms fully.

3. **Nature of Relationship.** Distributor, as a Distributor of Licenser, shall be an independent contractor. Nothing in this Agreement shall be construed to create any other relationship. Distributor is hereby advised that, as an independent contractor, it has certain responsibilities under the federal and state tax laws. For example, Distributor must report all Fees to the IRS on the appropriate income tax form and pay any federal income taxes due with respect to these amounts. In addition, Distributor must report all Fees on the appropriate self-employment tax form and pay any self-employment (SECA) taxes with respect to these amounts. For any Distributor who does not maintain a valid Tax Identification Number (TIN), to assist Distributor in complying with these requirements, Licenser will, after the close of each calendar year, furnish Distributor with a copy of the Form 1099 Income Statement for any Fee amounts paid directly by Licenser to Distributor.

Licenser recommends that Distributor obtain professional advice and assistance to comply with these and other laws and regulations applicable to Distributor as an independent contractor. Nothing in this Agreement shall be deemed to create a contract of engagement or employment for any term.

4. **Responsibilities of Distributor.**   The duties of Distributor shall be to:

    a.   Use its best efforts to solicit End-Users to enter into License Agreements for Licensed Products;

    b.   Conduct its business so as to maintain and increase the goodwill and reputation of Licenser and the Licensed Products;

    c.   Pay all expenses incurred by Distributor in the performance of its duties under this Agreement, including (a) dues and fees for membership in any local, state, or national trade association or attendance at seminars or conventions; (b) local and long-distance transportation expenses; and (c) expenses in connection with the solicitation of End-Users and the operation of Distributor's business, including telephone, delivery, entertainment, and promotional expenses;

    d.   Use only promotional material approved by Licenser for purposes of promotion of the Licensed Products, and accurately and fairly represent the capabilities and functionality's of the Licensed Products to prospective licensees;

    e.   Ensure that all License Agreements obtained from End-Users are accurately completed before submission and accompanied by a check for the initial license fee for each of the Licensed Products licensed thereunder;

    f.   Forward promptly all License Agreements obtained from End-Users to Licenser's designated contract administrator;

    g.   Collect and remit promptly to Licenser's designated accounts administrator all initial license fees due under License Agreements obtained from End-Users;

    h.   Comply fully with all applicable federal, state, and local laws, regulations, and ordinances;

    i.   Deliver promptly to End-Users from whom License Agreements are obtained all packages and materials sent to Distributor by Licenser for delivery to End-Users; and

    j.   Prepare and timely deliver to Licenser such activity and production reports as it may from time to time require.

5. **Limits of Authority.**   Distributor shall not, without prior written approval from an authorized representative of Licenser, take any of the following actions:

    a.   Waive, alter, or change any provision of any License Agreement;

    b.   Modify or extend the amount of or time for the payment of any charge or fee required under any License Agreement;

    c.   Enter into any contract with End-Users with respect to the Licensed Products, it being understood that all contracts and licenses which are received from End Users are received subject to acceptance and approval by the Licenser's contract administrator;

    d.   Incur any expense or obligation in the name of Licenser;

    e.   Disseminate any printed material regarding the Licensed Products or Licenser's business other than that which has been expressly approved by Licenser; or

    f.   Use Licenser's name, trade names, trademarks, or logos in connection with its business other than in the manner expressly authorized in Licenser's advertising and promotional guidelines.

    g.   All business records maintained by Distributor relating to the Licensed Products are subject to inspection at any reasonable time by Licenser's authorized representatives.

*NO - THIS PM*
*OK*
*PM*

**6. Remittance all License Fees...** [Distributor shall allow the Licenser to withdraw payment when due electronically from the Distributor's account.] The Distributor will promptly remit all funds due to the Licenser within thirty (30) days of the invoice date. All unpaid balances will accrue interest at a rate of 1.5% or maximum permitted by law which ever is higher. Any payments made by the Distributor in the form of check will incur a three- percent (3%) service charge. The Licenser may refuse future shipments if the Distributor's account remains unpaid after thirty (30) days. All travel, lodging and sundry expense will be due as they are incurred.

**7. Payment of Fees.** The compensation and Fees to be paid to Distributor are set forth in Exhibit A herein. Except as may otherwise be set forth in such Exhibit, Distributor shall be compensated by Licenser for its services solely on the basis of Fees earned on License Agreements obtained by Distributor, and such compensation shall bear no relationship whatsoever to the number of hours expended by Distributor in performing such services. The payment of any Fees to Distributor shall be subject to all of the terms and conditions of this Agreement. The calculation and amount of such Fees set forth in Exhibit A may be changed by Licenser from time to time with respect to any License Agreement obtained by Distributor after the date of the change provided that it gives Distributor at least 30 days' written notice. Applicable rules and procedures of the Company for Licensed Products and License Agreements not listed in the Fee Schedule shall govern the payment of Fees.

**8. Deductions.** Licenser shall be entitled to exclude or deduct from Fees (1) any expenses chargeable to Distributor in connection with the operation of Distributor's business or Distributor's negotiation of the License Agreement; (2) any portion of a Fee payable to another organization or individual involved with the License Agreement; (3) Fees payable on license fees evidenced by checks, notes, or credit (until collected); and (4) any charge backs authorized under this agreement. No Fees will be paid on License Agreements placed by Licenser under alternative distribution or marketing programs unless Licenser expressly agrees to do so. In addition, Licenser at any time may offset against all Fees accrued or to accrue to Distributor any indebtedness of Distributor due Licenser or its affiliates (including indebtedness resulting from advances) arising in connection with Distributor's responsibilities under this or any other previous agreement with Licenser or its affiliates.

**9. Splitting Fees.** In no event will Licenser be liable for more than one single Fee for each Software Offering licensed by an End-User. Should more than one organization and/or individual claim any right to a Fee, a single Fee will be apportioned among the claimants as determined by Licenser in its sole discretion. Organizations and individuals having a claim in each transaction will, if practical, be consulted before any dispute is settled. Such amounts shall be placed in a separate account and shall be used only for payment of expenses incurred by Licenser in connection with the resolution of such disputes. Upon the resolution of such a dispute, as determined by Licenser, the remainder of any amount reserved for such dispute, if any, shall be refunded to Distributor. Notwithstanding anything to the contrary in this Agreement or in the Fee Schedule, in computing Fees as set forth in the Fee Schedule, the determination of Licenser with respect to the classification of License Agreements and the applicable Fee rates shall be final and binding.

**10. Statements.** Licenser shall mail Distributor a quarterly statement showing Fees earned and deductions made during the period covered by the statement. The statement will be deemed to be correct unless Distributor notifies Licenser of an objection in writing within 30 days after the date the statement is mailed. At no time shall Licenser be obligated to reimburse Distributor for any expenses unless it agrees to do so in writing.

**11. Voluntary Termination.** Either Licenser or Distributor may terminate this Agreement after the initial Three (3) years or at any time without cause by giving the other party 30 days' prior written notice. No prior notice shall be required of Licenser for termination during the first 90 days, which shall be considered a probationary period. Provided the Agreement is terminated within the initial ninety (90) days of the Effective Date by the Licenser, all prepaid and unused Fees will be refunded to the Distributor. On or prior to the effective date of termination of this Agreement (the "Termination Date"), Distributor shall submit to Licenser (1) a complete list of all prospective or pending licenses in which Distributor was involved prior to the termination of this Agreement and that have not been consummated or otherwise finalized at the time of such termination; (2) a complete list of the identities of any End-Users who are known to Distributor in connection with such prospective or

pending licenses; and (3) a complete report on the status of all negotiations pending with respect to such prospective or pending licenses, including the names of any cooperating organizations or individuals. Distributor further agrees to deliver to Licenser on or before the termination date, all marketing aids in its possession, including copies of the Licensed Products and related marketing or technical literature. Provided that Distributor complies with the foregoing termination requirements, in the event that any prospective or pending license becomes the subject of a binding and effective License Agreement within 60 days after the date of such termination, and Licenser determines that Distributor was the direct procuring cause of such License Agreement, Distributor shall be entitled to receive Fees on the initial license fees paid under such License Agreement on the basis set forth in Sections 7, 8, and 9 of this Agreement.

**12. Involuntary Termination.** Licenser may terminate this Agreement immediately, without notice to Distributor, for just cause. A termination shall be deemed "for just cause" if Distributor:

a. Breaches any provision of this Agreement;
b. Violates any law or regulation;
c. Commits, pleads guilty or nolo contendere to, or is convicted of, an act or offense involving moral turpitude;
d. Commits any willful or dishonest act that could injure Licenser; or
e. Fails to meet minimum performance standards established by Licenser in its sole discretion from time to time.
f. Fails to make required payments to the Licenser, or if invoices due the Licenser remain unpaid for sixty (60) days or more after notification from the Licenser that the invoice(s) are past due.

If this Agreement is terminated for cause or if Licenser, before or after the termination of this Agreement, should discover that Distributor has committed or is committing any of the acts described in items (1) through (4) of this Section 12, Distributor shall no longer be entitled to earn or receive from Licenser or its affiliates any accrued, deferred, or otherwise unpaid Fees under this Agreement. A termination of Fees under this section shall not constitute an election by Licenser to forego any claim it may have against Distributor. The failure of Licenser to exercise any of its rights under this section shall not preclude it from invoking these rights in the future based on the same or other circumstances.

**13. Confidentiality.** Distributor acknowledges that Licenser has a proprietary interest in, as well as the exclusive claim to the benefit of, the association of its Distributors and personnel and the business of the customers with whom such Distributors and personnel interact, including the opportunities, information, and goodwill pertaining thereto. Accordingly, Distributor shall provide Licenser with the full benefit of all work and contacts relevant to the business of Licenser throughout the term of this Agreement. Distributor shall maintain in strict confidence, and shall not use or disclose except as required to perform its duties for Licenser, all Trade Secrets of Licenser. This obligation shall apply during and after the term of this Agreement for so long as the pertinent information or data remain Trade Secrets, and shall apply regardless of whether the Trade Secrets are in written or tangible form. For purposes of this Agreement, law to consist of legally protected rights in confidential information defines a Trade Secret. Without limiting the generality of the foregoing, Trade Secrets of Licenser include non-public information regarding the products of Licenser (including the Licensed Products), names and addresses of any End-Users, sales Distributors or distributors of the Licensed Products, product pricing information, account invoices, training and educational manuals, administrative manuals, and prospective customer leads developed by Licenser, in whatever form, regardless of whether computer or electronically accessible "on-line." However, Trade Secrets do not include information Distributor possesses or acquires independently of Distributor's activities or duties as an Distributor of Licenser. The foregoing obligation shall continue to apply for 5 years after termination of this Agreement.

**14. Trademarks.** Distributor acknowledges that all rights in any trademarks associated with the business of Licenser (i.e., trademarks, service marks, slogans, logos, designs, and other similar means of distinction), including all goodwill pertaining thereto, shall be the sole property of Licenser. Distributor may use and display such trademarks only in the manner and for the purpose authorized by Licenser, and only during the term of this Agreement. Licenser reserves the right to add to, change, or discontinue the use of any trademark, on a selective or general basis, at any time. Distributor shall not use any trademark or trade name of Licenser in any corporate, partnership, or business name without

Licenser's prior written consent. Upon the termination of this Agreement, Distributor shall cease all further use in its business of trademarks or trade names identical or similar to Licenser's.

**15. Return of Materials.** Upon the request of Licenser and, in any event, upon the termination of Distributor's engagement, Distributor shall deliver to Licenser all software, memoranda, notes, records, drawings, manuals, disks, or other documents and media pertaining to Licenser's business or Distributor's activities or duties as a Licenser Distributor, including all copies, extracts, summaries, and analyses thereof. This obligation shall not apply to publicly distributed documentation, or internal business or personal records of Distributor's own creation that do not contain Licenser Trade Secrets.

**16. Arbitration.** Except as set forth in Section 17 hereof, any claim, controversy, or dispute arising between the parties with respect to this Agreement, to the maximum extent allowed by applicable law, including disputes as to arbitrability, shall be submitted to and resolved by arbitration. The arbitration shall be conducted pursuant to the terms of the Federal Arbitration Act and (except as otherwise specified herein) the Commercial Arbitration Rules of the American Arbitration Association, before a single arbitrator, and the hearing shall be held in Stamford, Connecticut. Either party may notify the other party at any time of the existence of an arbitrable controversy by certified mail and shall attempt in good faith to resolve their differences within fifteen days after the receipt of such notice. Notice to Distributor shall be sent to Distributor's principal address set forth below, and notice to Licenser shall be sent to: General Councel, Success Systems, Inc., Post Office Box 2457, 45 Church Street Suite 106, Stamford, CT 06906. If the dispute cannot be resolved within the fifteen-day period, either party may file a written demand for arbitration with the other party. The party filing such demand shall simultaneously specify his, her, or its arbitrator, giving the name, address, and telephone number of said arbitrator. The party receiving such notice shall then notify the party demanding the arbitration of his, her, or its arbitrator, giving the name, address, and telephone number of the arbitrator within five days of the receipt of such demand. The arbitrator named by the respective parties need not be neutral. The American Arbitration Association, on request by either party, shall appoint a neutral person to serve as the third arbitrator, and shall also appoint an arbitrator for any person failing or refusing to name his arbitrator within the time specified in this Section 16. The arbitrators thus constituted shall promptly meet, select a chairperson, fix the time and place of the hearing, and notify the parties. To the extent practical, the arbitrators shall provide for the hearing to commence within sixty days after the arbitrators have been impaneled. The majority of the panel shall render an award within ten days of the completion of the hearing, and shall promptly transmit an executed copy of the award to the respective parties. The award of the arbitrators shall be final, binding, and conclusive upon the parties hereto. Each party shall have the right to have the award enforced by any court of competent jurisdiction.

**17. Remedies.** In the event of any breach by Distributor of Section 13 of this Agreement, the resulting injuries to Licenser would be difficult or impossible to estimate accurately, but it is certain that injury or damages will result to the business of Licenser. Distributor therefore agrees that, in the event of any such breach, Licenser shall be entitled, in addition to any available legal or equitable remedies for damages, to an injunction to restrain the violation or anticipated violation thereof. Should Licenser have any basis to seek such legal or equitable action, Distributor shall pay any and all attorney fees and court costs that Licenser may incur. Licenser's rights under this section shall be in addition to every other remedy (equitable, statutory, legal, or contractual) to which Licenser may be entitled. With the exception of violations of the terms of Sections 13 and 14, under no circumstances shall either party be liable to the other for indirect, incidental, special, consequential or punitive damages, whether in contract or in tort (including negligence and strict liability), resulting from its performance or failure to perform under this agreement.

**18. Replacement.** During the term of this Agreement and for 3 years after this Agreement is terminated, if Distributor induces, directly or indirectly, or encourages anyone else to induce, directly or indirectly, any End-User from whom Distributor has obtained a License Agreement to terminate or replace the License Agreement or its use of the Licensed Products licensed thereunder, in favor of any competing, non-Licenser-sponsored computer software product, then Distributor's rights to any unpaid Fees shall cease immediately, and Distributor shall repay 100% of all Fees it received during the prior 3 years with respect to the License Agreements that are terminated or replaced as a result of Distributor's actions. *unless licenser fail to perform to our customers satisfaction*

Success Systems, Inc.   Page 9 Confidential Distributor Information   rev 3 3/99

**19. Guarantee.** If Distributor is a partnership or a corporation, each of the partners or corporate officers executing this Agreement on behalf of Distributor individually and personally guarantees in all respects the performance by Distributor of each of its obligations under this Agreement.

**20. Indemnity.** Distributor acknowledges and agrees that Licenser shall have no obligation (e.g., for payment of Fees or other compensation or fees) to Distributor or any member of Distributor's organization other than as expressly set forth in this Agreement. Distributor shall indemnify Licenser fully for any cost, liability, or harm suffered by Licenser, including reasonable attorney fees, as a direct or indirect result of Distributor's breach of any of the terms of this Agreement, or Distributor's misrepresentation, fraud, or negligence with respect to any End-User or License Agreement.

**21. Miscellaneous.** No assignment by Distributor of this Agreement or any Fees due hereunder shall be valid unless approved in advance by an authorized officer of Licenser. No modification or waiver of any provision of this Agreement shall be binding on Licenser unless made in writing and signed by an authorized officer of Licenser. The laws of the State of Connecticut govern this Agreement as it applies to a contract executed, delivered, and performed in such state, without regard to its principals concerning conflicts of laws. This Agreement supersedes and replaces any agreement previously entered into between Distributor and Licenser. Licenser's failure to enforce any provision of this Agreement shall not constitute a waiver of any provision of this Agreement. The provisions of this Agreement shall be deemed cancelable. In the event that any provision of this Agreement is determined to be unenforceable or invalid, such provision shall nonetheless be enforced to the fullest extent permitted by applicable law, and such determination shall not affect the validity and enforceability of any other remaining provisions of this Agreement. This Agreement, together with all schedules attached hereto and all writings incorporated herein by reference, constitutes the entire agreement between Distributor and Licenser with respect to the subject matter of this Agreement.

**AGREED:**

**LICENSER**

By:
Scott J. Tarlow
Its President

Effective Date of Agreement:

Date signed:

**DISTRIBUTOR**

| Printed Name: DENNIS R MADDY | Printed Title: President |
|---|---|
| Authorized Signature: Dennis R Maddy | Date: 9/15/00 |

## Release of Corporate and Personal Information

To whom this may concern:

This will be your authority and my request for you to release any information requested concerning personal and/or company credit standing:

| Field | Value |
|---|---|
| Corporate Name: | MADDY PETROLEUM EQUIPMENT INC. |
| t/a or d/b/a: | |
| Federal ID #: | 31-1284751 |
| Year Incorporated | 198_ |
| Mail Drop Address: | 351-5 LOWERY CT. |
| Shipping Address: | SAME |
| Telephone #: | 614-836-9668 |
| E-mail Address: | DENNMAD@AOL.COM |
| Fax #: | 614-836-_1713 |
| City: | GROVEPORT |
| State | OHIO |
| Zip | 43125 |

Authorized Signature

DENNIS MADDY
Print Name

x_____

## Wire Transfer Authority

As an authorized officer of ___N/A - DM___ (legal entity name), I hereby authorize the transfer of funds due Success Systems, Inc. by Electronic Funds Transfers (EFT), from any account owned or controlled by of _____ (Legal entity name).

___N/A - DM___
Authorized Signature

___N/A - DM___
Print Name

Attach Voided Check Here -- NO ON THIS DM

### Exhibit A - Licensed Products
#### Distributor Prices *Gold* Program

| Requires initial Inventory Purchase of two re-sellable licenses of ScannerWare – Fuel [$7,992.00 distributor cost]) | SRP | Margin |
|---|---|---|
| **RepairWare PLUS™ for Windows** - Bay management, work order generation, service reminders, Inventory control and daily accounting | $2,495 | 20% |
| **ScannerWare for Windows** - Windows based daily bookkeeping, inventory control, fuel management and price book software - single user, single CPU | $4,995 | 20% |
| **ScannerWare - HQ™ for Windows** - headquarters based daily bookkeeping, inventory control, fuel management and price book software - single user, single CPU permits the ability to consolidate store level ScannerWare for Windows versions and make zoned sensitive price changes (requires ScannerWare Store™ for Windows | $9,995 | 20% |
| **ScannerWare - Store™ for Windows** - Store level based daily bookkeeping, inventory control, fuel management and price book software - single user, single CPU permits the ability for store level ScannerWare for Windows versions to control POS communications, store level accounting, inventory control and price maintenance. (requires ScannerWare HQ™ for Windows | $2,995 | 20% |
| **Store 2000™ -** *Grocery - Non-fueling* Bookkeeping, Inventory control, fuel management and price book software - single user, single CPU | $4,995 | 20% |
| Network version upgrade from single CPU - (per station) | $795 | 20% |
| multi-user Network Fee (per additional workstation) | $795 | 20% |
| EDI (Electronic Data Interchange) | $495 | 20% |
| **Success Systems® Communications** | | |
| For Tokheim, RPS Micro-Max Pro I, II or III (PC/PRO Link™) | See 1 | |
| For Gilbarco TCR-2,4,15 or G-4 (PC version) [bi-directional] | $295 | 12% |
| NCR PC communication software Link | $695 | 20% |
| Verifone Ruby Gem Comm™ - [bi-directional] | $295 | 20% |
| Wayne-Comm™ for Windows - Dresser Ind. - Wayne Plus II or III [bi-directional] | $295 | 20% |
| **Personalized Training** | | |
| Custom Price Book creation and installation: Includes: Reading UPC / SKU items in the store at the time of service, assigning a retail price, description and department to each item. When available electronically from a food wholesaler vendor, product numbers will be matched to the UPC item. Information will be imported into ScannerWare™ and uploaded to the POS terminal ScannerWare departments, applicable mapping will be edited. Includes up to 3 days on site training and installation assistance | $2,995 | 20% |
| RepairWare™ for Windows ( $395.00 per day on site) | $395.00 | 10% |
| ScannerWare™ for Windows ( $395.00 per day on site) per days | $395.00 | 10% |
| Telephone Training ($29.50 per 1/2 hour Includes telephone fees) | | |
| Travel Time Maximum of four (4) hours per day   Mileage $.35 per mile | $39.50 | 0% |
| **Hardware** | | |
| Percon TopGun™/PT2000 and PT Dock Includes: built in laser, docking station power unit 1 MB memory Success Systems software ( | $2,495.0 | 20% |
| Percon™/PT2000 Includes: built in CCD pen, RS232 cable connector, and power supply 256KB memory Success Systems software | $1,895 | 20% |
| Metrologic MS 6270 Laser Scanner with manufacturer warranty, cable and programming | $795.00 | 25% |
| DataSym 6000 POS terminal - Base unit Includes cash draw, pop up display, 60ft Comm2000, PC interface cable, memory for 5,000 SKUs, MS6720 scanner. | Custom quote | - |

The warranty provided by the manufacturer of each item of hardware and software constituting the goods is the sole warranty relating thereto. Licenser expressly disclaims any and all warranties, expressed or implied, including but not limited to any implied warranties of merchantability and/or fitness for a particular purpose.. (1) Selling Restrictions apply to the licensing of Licenser's products for use with Tokheim PRO I, II, III.

Success Systems, Inc.    Page 12 Confidential Distributor Information         rev 3 3/99

### Exhibit A Licensed Products
### Distributor Prices *Platinum* Program

| Requires initial Inventory Purchase of $30,000.00 of re-sellable licenses of Licenser's manufactured products | SRP | Margin |
|---|---|---|
| **RepairWare ™ for Windows** - Bay management, work order generation, service reminders, inventory control and daily accounting | $2,495 | 40% |
| **ScannerWare for Windows** – Windows based daily bookkeeping, inventory control, fuel management and price book software - single user, single CPU | $4,995 | 40% |
| **ScannerWare - HQ™ for Windows** – headquarters based daily bookkeeping, inventory control, fuel management and price book software - single user, single CPU permits the ability to consolidate store level ScannerWare for Windows versions and make zoned sensitive price changes (requires ScannerWare Store™ for Windows | $9,995 | 40% |
| **ScannerWare - Store™ for Windows** - Store level based daily bookkeeping, inventory control, fuel management and price book software - single user, single CPU permits the ability for store level ScannerWare for Windows versions to control POS communications, store level accounting, inventory control and price maintenance. (requires ScannerWare HQ™ for Windows | $2,995 | 40% |
| **Store 2000™ - Grocery - Non-fueling** Bookkeeping, inventory control, fuel management and price book software - single user, single CPU | $4,995 | 40% |
| Network version upgrade from single CPU - (per station) | $795 | 40% |
| multi-user Network Fee (per additional workstation or ScannerWare-HQ polling sites | $795 | 40% |
| EDI (Electronic Data Interchange) | $495 | 40% |
| **Success Systems® Communications** | | |
| For Tokheim, RPS Micro-Max Pro I, II or III (PC/PRO Link™) | See 1 | |
| For Gilbarco TCR-2,4,15 or G-4 (PC version) [bi-directional] | $295 | 12% |
| NCR PC communication software Link | $695 | 20% |
| Verifone Ruby Gem Comm™ - [bi-directional] | $295 | 30% |
| Wayne-Comm™ for Windows - Dresser Ind. - Wayne Plus II or III [bi-directional] | $295 | 30% |
| **Personalized, Training** | | |
| **Custom Price Book creation and Installation**: Includes: Reading UPC / SKU items in the store at the time of service, assigning a retail price, description and department to each item. When available electronically from a food wholesaler vendor, product numbers will be matched to the UPC item. Information will be imported into ScannerWare™ and uploaded to the POS terminal ScannerWare departments, applicable mapping will be edited. Includes up to 3 days on site training and installation assistance | $2,995 | 20% |
| RepairWare™ for Windows ( $395.00 per day on site) | $395.00 | 10% |
| ScannerWare™ for Windows ( $395.00 per day on site)  per days | $395.00 | 10% |
| Telephone Training ($29.50 per 1/2 hour Includes telephone fees) | $39.50 | 0% |
| Travel Time Maximum of four (4) hours per day   Mileage $.35 per mile | | |
| **Hardware** | | |
| Percon TopGun™/PT2000 and PT Dock Includes: built in laser, docking station power unit 1 MB memory Success Systems software | $2,495.0 | 30% |
| Percon™/PT2000 Includes: built in CCD pen, RS232 cable connector, and power supply 256KB memory Success Systems software | $1,895 | 30% |
| Metrologic MS 6270 Laser Scanner with manufacturer warranty, cable and programming. Includes Licensor swap out warranty for twenty-two months. | $795.00 | $515.00 |
| DataSym 6000 POS terminal - Base unit includes cash draw, pop up display, 50ft Comm2000, PC Interface cable, memory for 5,000 SKUs, MS6720 scanner. | Custom quote | |

The warranty provided by the manufacturer of each item of hardware and software constituting the goods is the sole warranty relating thereto. Licenser expressly disclaims any and all warranties, expressed or implied, including but not limited to any implied warranties of merchantability and/or fitness for a particular purpose.. (1) Selling Restrictions apply to the licensing of Licenser's products for use with Tokheim PRO I, II, III.

Success Systems, Inc.   Page 13 Confidential Distributor Information                rev 3 3/99

## Success Systems, Inc.
### Platinum Distributor
### Inventory Commitment Payment Modification
### October 12, 2000 Distributor Agreement Addendum

| | |
|---|---|
| **Summary of Change:** | This Addendum modifies the Distributor payment schedule for the initial inventory commitment. |
| **Exclusions:** | In the event that the Distributor orders more Success Systems Licensed products than have been paid for applicable provisions in paragraph six (6) and seven (7) of the Distributor Agreement will apply. |
| **Payment Schedule:** | The Distributor agrees to make an initial payment of fifteen thousand dollars ($15,000.00) at the time this Addendum is executed. The remaining fifteen thousand dollars ($15,000.00) will be paid in monthly payments of twenty-five hundred dollars ($2,500.00) commencing November 15, 2000. |
| **Remittance Instructions:** | Electronic funds transfers may be made to:<br>Success Systems, Inc.<br>c/o Peoples Bank of Connecticut, Bridgeport CT<br>Glenbrook Branch<br>Hope Street<br>Stamford, CT 06906<br>Account #: 038 7007830<br>Routing #: 221 172 186 |

CONFNBIMETC
1714

Addendum Dated: 10/13/2000

**Licesnser**

Authorized Name (print): Scott J. Tarlow

Authorized Signature: _____

Date: _____

**Distributor:**

Authorized Name (print): Dennis R. Maddy

Authorized Signature: _[signed]_

Date: 10/13/00

# Price List - Software
## Effective August 1, 2000
### *Confidential*

08/01/00

| | Suggested List Price |
|---|---|
| ScannerWare™ for Windows *Single user, non-network version for a single station* | $4,995.00 |
| ScannerWare – HQ™ - *Home Office Base Software* | $9,995.00 |
| ScannerWare – Store™ *Store Level Base Software (requires ScannerWare - HQ) 1 – 10 stores each* | $2,995.00 |
| ScannerWare – Store™ *Store Level Base Software (requires ScannerWare - HQ) 11 or more stores each* | $2,695.00 |
| (EDI) Electronic Data Interchange for selected food wholesalers * | $495.00 |
| Store 2000™ for Windows *Single user, non-network version for a single station* | $5,995.00 |
| RepairWare™ for Windows *Single user, non-network version for a single station* | $2,495.00 |
| Multi-Site – *Additional Stations managed within one CPU, per station* | $795.00 |
| Network Version - *multi-user version upgrade* | $795.00 |
| Multi-User - Network Version - *multiple users sharing same database, per CPU (any product each user)* | $795.00 |
| **Success Systems® POS Communication Software** | |
| For Pro I, II, III (PC/PRO Link™) | Tokheim |
| For Dresser Wayne Plus II, III   [bi-directional] - | $295.00 |
| For Gilbarco C-2, C-15 & PC based - Using GSKAN™ [bi-directional] | $295.00 |
| For Verifone Ruby - Using Gem Comm™ [bi-directional] | $295.00 |
| NCR 2170GP communication module -   [bi-directional] | $895.00 |
| **Personalized, Training** | |
| On site software training and installation services (7 hours) | $495.00 |
| Custom Price Book creation and Installation: Includes: Reading UPC / SKU items in the store at the time of service, assigning a retail price, description and department to each item. Purchaser's assistance required for department assignment. When available electronically from a food wholesaler vendor, product numbers will be matched to the UPC item. Information will be imported into ScannerWare™ and uploads to the POS terminal ScannerWare departments, applicable mapping will be edited   Also includes up to 3 days on site training and installation assistance | 2,995.00 |
| On site POS training (6 hours) | $395.00 |
| Installation services % of hardware purchase price (point of sale equipment only) | 6% |
| Travel Fee $.35 per mile (portal to portal) | $.45/mile |
| Travel Time billed portal to portal – maximum 4 hours round trip | $75.00 per hour |

* Requires compatible wholesaler – food supplier

# Price List
# Hardware
# Effective January 1, 2000
## *Confidential*

| | 08/01/00 |
|---|---|
| | SRP |
| Metrologic MS 6720 scanner manufacturer's 2 year warranty. Includes cable and programming | $795.00 |
| Percon includes 256KB, RS232 cable, power pack, pen CCD reader | $1,495.00 |
| Percon includes 512KB, RS232 cable, power pack, pen CCD reader | $1,670.00 |
| Percon includes 1 MB, RS232 cable, power pack, pen CCD reader | $1,845.00 |
| Percon TopGun includes 256KB, cradle, power charger, laser reader | $2,095.00 |
| Percon TopGun includes 512KB, cradle, power charger, laser reader | $2,245.00 |
| Percon TopGun includes 1 MB, cradle, power charger, laser reader | $2,495.00 |
| NCR 2170 cash register: Includes memory for up to 4,000 SKU file Includes: 2170 RS-232 Duel Comm. Port Board, 80-key standard keyboard, Alpha/Numeric operator's display, Standard cash draw and till, Numeric Customer poll display, thermal printer, base unit tray, | $2,710.00 |
| NCR 2170 memory module includes memory for additional 4,000 SKU file | $245.00 |

The warranty provided by the manufacturer of each item of hardware and software constituting the goods is the sole warranty relating thereto. SELLER EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE.