UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

| | |
|---|---|
| SUCCESS SYSTEMS, INC. | : CIVIL CASE NO.: 3:01CV1343 (MRK) |
| Plaintiff, | : |
| v. | : |
| MADDY PETROLEUM EQUIPMENT, INC., | : |
| Defendant. | : January 30, 2004 |

---

AFFIDAVIT OF WARREN L. HOLCOMB IN OPPOSITION TO
MOTION TO VACATE AND/OR MODIFY ARBITRATION AWARD

I, Warren L. Holcomb, hereby depose and say:

1. I am over the age of eighteen years and believe in the obligation of an oath.

2. I am the attorney representing the defendant Maddy Petroleum Equipment, Inc. ("Maddy" or "defendant") in connection with this matter, and I represented Maddy at the arbitration hearings and other matters concerning the arbitration. As such, I have personal knowledge and am generally familiar with the testimony and exhibits that were presented at the arbitration hearings.

3. Two and one-half days of arbitration hearings were conducted before Arbitrator Ernest Fanwick, Esq., a highly experienced arbitrator mutually selected by the parties, on September 27, 28, and 29, 2003. There was no court reporter, and the testimony at the arbitration hearings was not recorded by tape recorder or otherwise. The plaintiff introduced 35 or more exhibits into evidence at the arbitration hearings and the defendant introduced at least 23 exhibits into

evidence. Dennis Maddy, the founder and president of the defendant, Ed Bletz, one of the defendant's salesmen, and Scott Tarlow, the president of the plaintiff, testified at the arbitration hearings. No third party witness was called to testify in support of the allegations of the plaintiff's counterclaims that the defendant breached the confidentiality provisions of Section 13 of the distributorship agreement and misappropriated confidential trade secrets in violation of CUSPA and CUTPA.

4. The arbitration was conducted under the auspices of the American Arbitration Association ("AAA") and as required by Section 16 of the Distribution Agreement (Exhibit B) pursuant to the AAA Commercial Arbitration Rules. At the outset of the second day of the arbitration hearing, Arbitrator Fanwick informed the parties and their respective counsel in substance that the AAA Commercial Arbitration Rules provide that an arbitrator may include attorney's fees in an award if both parties request attorney's fees or if attorney's fees are authorized by the agreement. In the arbitration, all parties requested attorney's fees in that both the plaintiff and the defendant requested attorney's fees. Arbitrator Fanwick further stated in substance that the distribution agreement authorized attorney's fees to be awarded so that under the AAA Commercial Arbitration Rules, he had the authority to award attorney's fees to either party.

5. An excerpt from the AAA Commercial Arbitration Rules is attached to the defendant's memorandum in opposition as Exhibit D. To the best of my knowledge and belief, the rules in Exhibit D were the same as the rules in effect on June 21, 2001 when Maddy filed the original demand for arbitration with the AAA in this case.

6. Attached as Exhibit A to this affidavit is a true and correct copy of Claimant's (Maddy's) Post-Hearing Brief dated November 18, 2003. The section entitled "The Evidence" on pages 1

through 17 of said post-hearing brief to the best of my recollection and belief accurately summarizes the substance of the salient testimony and other evidence presented at the arbitration hearings.

7. At the last hearing at the end of the presentation of testimony and evidence, the arbitrator inquired of each party whether it had any further proofs to offer or witnesses to be heard. Both parties replied in the negative. Both parties filed post-arbitration hearing briefs.

8. On or about March 6, 2002, I returned to the plaintiff the sales and marketing materials that had been provided to the defendant by the plaintiff. A true and exact copy of my cover letter is attached as Exhibit B and a copy was admitted into evidence at the arbitration hearing. In the letter, I requested to be immediately notified if the plaintiff believed that all of the materials had not been returned. The plaintiff never notified me that all of the materials had not been returned. However, at the arbitration hearing, Mr. Tarlow for the first time claimed that the original of a disk he maintained he had given to Mr. Blest had not been returned. Both Mr. Bletz and Mr. Maddy testified in substance that they had returned all of the sales and marketing materials provided by Success Systems that had been in their possession to the plaintiff.

I declare under penalty of perjury that all of the foregoing is true and accurate to the best of my knowledge, information and belief.

_____
Warren L. Holcomb

Subscribed and sworn before me this 30th day of January 2004.

_____
Notary public Jennifer B. Jasensky
My commission expires 2/28/04

## CERTIFICATION

This is to certify that a copy of the foregoing Affidavit of Warren L. Holcomb was mailed on January 30, 2004 by U.S. Mail first class, postage prepaid to the following:

Joseph M. Pastore, III, Esq.
Thomas J. Lengyel, Esq.
Brown, Raysman, Millstein, Felder & Steiner LLP
CityPlace II
185 Asylum Street
Hartford, CT  06103

_____
Warren L. Holcomb

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of the Arbitration between | : |
| MADDY PETROLEUM EQUIPMENT, INC.<br>Claimant, | : No. 12 E 181 00446 1 |
| v. | : |
| SUCCESS SYSTEMS, INC.<br>Respondent | : November 18, 2003 |

## CLAIMANT'S POST HEARING BRIEF

### The Evidence

The claimant Maddy Petroleum Equipment, Inc. ("Maddy") is a small company based in Groveport, Ohio engaged in the business of selling petroleum equipment, including commercial dispensers, nozzles, tank monitoring devices and point of sale (POS) cash register terminals, to convenience store/gas stations and service stations in Ohio and portions of West Virginia and Indiana. Dennis Maddy formed the company in 1985 and is the principal owner. Maddy has always represented a number of different brands of the same products. In 2000, Maddy distributed POS cash registers manufactured by Verifone, Suntronics/Wayne, MSI, Gilbarco and Tokheim.

Sometime around the fall of 2000, in response to customer inquiries, Mr. Maddy decided to have Maddy become a direct distributor of POS back office software products to his existing and new customers. Mr. Maddy believed that back office software products would complement the product lines the company already distributed, especially POS terminals.

1

In keeping with its standard practice of offering his customers a choice of more than one brand of product, in August of 2000, Mr. Maddy had discussions with Advantage Energy Software (AES) about the possibility of Maddy entering into a distributorship relationship. (Exhibit V[1]) Later in 2000, Mr. Maddy simultaneously entered into discussions and negotiations about becoming a distributor for two other back office software manufacturers, the respondent Success Systems, Inc. ("Success") and CMi Solutions ("CMi"). Unbeknownst to Mr. Maddy, Success and CMi were fierce competitors.

During his conversations with Scott Tarlow, the president of Success, Mr. Maddy mentioned that he was looking at a number of different back office software manufacturers, but he does not recall mentioning CMi to Mr. Tarlow. Most of the discussions by Mr. Maddy that led up to the Success distributorship agreement were with Jessie Altizer, the Success sales agent in the Ohio territory. Mr. Maddy testified that he told Mr. Altizer he intended to distribute back office software products of a number of different companies and specifically mentioned to Mr. Altizer that one of those companies was CMi. Mr. Maddy further testified that Mr. Altizer represented to him that in the event things did "not work out" with Maddy as a Success distributor, the balance any amount of the initial inventory purchase fees for re-sellable software licenses would be refunded to Maddy. Mr. Maddy relied upon that representation in entering into the distributorship agreement with Success.

In September 2000, Success was in the process of trying to sell back office software to Englefield Oil and Black Gold, two of Maddy's pre-existing customers. Mr.

---

[1] Hereinafter exhibits will be referenced by number or letter in parentheses without using the word "exhibit"

2

Altizer and Mr. Tarlow pressed Maddy to enter into the distributor agreement so Success could use Maddy's name to promote sales to those two companies promising that Maddy could share in the commissions. The distributor agreement between Success and Maddy was a standard form contract drafted by Success. Although Maddy raised a number of issues and proposed language changes, the Success distributor agreement was signed by Maddy on September 15, 2000 without any change to the standard contract language.

Under Exhibit A, in exchange for becoming a platinum distributor receiving a 40% margin on software, Maddy was required to make an initial inventory purchase of $30,000 for 10 re-sellable ScannerWare single licenses at $2,997 per license representing Success' portion of the $4,995 suggested retail price after subtracting the distributor's margin). (A at 385-386; 1 at SUC00084; E) Due to Maddy's cash flow problems, in mid-October the parties entered into an addendum under which the initial inventory commitment payment was payable $15,000 down with the balance to be paid in equal monthly installments of $2,500 commencing November 15, 2000. (1 at SUC00084) The agreement became effective upon receipt of the initial $15,000 payment of the prepaid inventory purchase fee.

The distributor agreement between Success and Maddy did not contain any provision excluding or restricting Maddy from simultaneously distributing other competing brands of back office software products. Section 11, which gave either party the right to terminate the agreement without cause upon 30 days written notice, contains a sentence that states: "Provided the Agreement is terminated within the initial

3

ninety (90) days of the Effective Date by the Licensor, all prepaid and unused Fees will be refunded to the Distributor." (1 at SUC00079)

However, neither Section 11, Exhibit A, the inventory commitment payment modification addendum nor any other provision of the distributorship agreement states that the initial inventory purchase payments are non-refundable. (A; 1)  In addition, there is no provision explicitly providing that if the distributor terminates the agreement, the initial inventory payments are not refundable

The form distributor contract sent to Maddy by CMi contained a non-compete clause that would have prohibited Maddy from selling or licensing any products competitive with CMi's products. (H, Section 9)  At Maddy's request, the covenant not to compete was deleted from the CMi contract. (16; J)

Maddy executed the distributor agreement with CMi on October 17, 2000. (J) The next day, the distributorship agreement with Success became effective as a result of Maddy paying the initial $15,000 toward the inventory commitment fee.

Under both the Success and CMi distributor agreements, Madddy was required to use its "best efforts" to promote and market those companies respective products. (1, Section 4a; J, Section 2a)

Maddy received price lists from both Success and CMi that listed the suggested retail prices of their respective software and hardware products.  At all relevant times, Success back office software was significantly more expensive than CMi back office software.  The suggested list price of Success ScannerWare, non-network single user, was $4,995 compared to $3,995 for CMi's single user Price Book manager.  Success' home office software listed for $9,995 compared to $3,995 for CMi's home office

4

software. The list price for additional network store licenses of Success software was $2,995 each (for up to ten stores) whereas additional CMi licenses listed for $995.

Although Success and CMi are direct competitors, as acknowledged by Mr. Tarlow, the Success and CMi back office software solution products are dissimilar in that they have different features and strengths. As explained by Mr. Tarlow, CMi's strengths are in the general ledger and accounts payable back office functions whereas Success' strengths are more in the "front end" in terms of being easier to use and more "robust." Not surprisingly, Mr. Tarlow believes that Success back office software products are superior to those of CMi. In any case, material differences in features and functions, as well as price, exist between back office software products manufactured by Success and CMi.

At the beginning of its distributor relationship with Success, Maddy received a Sales Resource Guide and Product Summary ("Sales Resource Guide" or "Guide") in a binder with the word "confidential" clearly printed on the front cover. (10) The first section of the Sales Resource Guide contained a brief overview of the history of Success and its products and major relationships.

Part two of the Guide consisted of a copyrighted compact disc that contained a Success product and services overview. This disc contained three folders. The first folder was a return on investment program that was used to complete a return on investment analysis form given to prospective customers as a marketing tool. Success claims that the algorithm embedded in the ROI software constitutes a trade secret. However, Mr. Tarlow admitted that in making decisions to purchase equipment, businesses frequently perform ROI analyses. No evidence was introduced to show that

5

formulas used in the Success ROI compact disc were anything other than basic formulas that are generally known and readily replicable. The second folder in the product and services overview CD contained a PowerPoint sales presentation to be presented to the public at trade shows and seminars. The third folder in the CD was a distributor presentation. Although not recommended for viewing by end user prospects, there was no prohibition from doing so.

The third section of the Sales Resource Guide contained "marketing slicks" consisting of sales literature to be passed out at trade shows and to prospective customers. The fourth section describes companion hardware manufactured by other companies that can be used with Success ScannerWare software. The fifth section of the Sales Resource Guide contains user's manuals. The manuals are distributed to end users who purchase Success software licenses. As such, they are readily ascertainable by others through proper means. One need only purchase a license to receive the user's manual. Furthermore, while the source codes and programming embedded in Success' licensed software may qualify as proprietary trade secrets, the user's guides are of little or no economic value to competitors.

The Sales Resource Guide also contains a copyrighted product pre-installation guide that is a survey and questionnaire used in assessing the needs of potential customers. The Sales Resource Guide also contains a Success price list. The price list is marked "confidential" but contains suggested retail list of prices. Mr. Tarlow testified that potential customers were quoted a total "solutions" price without a breakdown of the individual components. While this may be true in some cases, in other cases it is not. For example, the quotes made by Mr. Altizer to Engelfield Oil Company in October and

6

November of 2000 contain a specific breakdown of the prices for each component. Neither quote to Engelfied Oil was marked "confidential" nor was there any evidence that Engelfield was not free to disclose those quotes to third parties. In addition, the Success price list in the Tokheim price book did not contain a "confidential" stamp. (W)

Maddy was also provided with a Success "Sales Tools" CD which according to Mr. Tarlow was used in end-user presentations. The actual contents of the Sales Tools CD was not introduced into evidence.

Maddy's distributor relationship with Success lasted only about five months. During that brief period, Maddy mailed Success marketing inserts to its targeted customers (U) and gave presentations of Success software solutions to various potential customers. Ed Bletz, the Maddy salesman responsible for back office software sales, testified that except where a sales lead originated from either Success or CMi, his standard practice was to explain the features and the differences between Success and CMi back office software products to potential customers and either follow the preference expressed by the customer or recommend the product that best suited the individual customer's needs. For example, Mr. Bletz quoted Success product to a customer named Railway Express because Success ScannerWare software interfaced with Railway's existing POS terminal equipment better than CMi's software did. Sales of Success back office software products generated higher commissions than sales of CMi software, but sales of CMi products overall generated slightly more profit to Maddy because Maddy installed the CMi software but not the Success software. Mr. Blest was paid a salary, and no part of his compensation was based on commissions. Maddy had $15,000 plus tied up in initial inventory purchase payments, and Mr. Maddy

encouraged Mr. Bletz to sell Success product so he could recoup his investment. Mr. Bletz testified that within the context of Maddy simultaneously acting as a distributor for both Success and CMi products (Maddy's distribution arrangements with Success and CMi were non-exclusive), he used his best efforts to sell both products. Mr. Bletz further testified that where the lead was not from either Success or CMi, he could not think of a single instance when he did not use his best efforts to promote both brands. Mr. Bletz was assigned as the sales person to market back office software. In Mr. Tarlow's opinion, "best efforts" did not require a separate salesman dedicated to Success and the amount of time spent marketing Success products could vary, with 5% of a distributor's time spent on marketing Success products being sufficient.

Unfortunately, the relationship between Maddy and Success soured. Based on a number of incidents, Maddy came to believe that Success was untrustworthy and unprofessional and that the association with Success was harmful to its business and its business reputation. The first incident occurred in connection with Engelfield Oil Company. Madddy was a distributor of MSI POS terminals. MSI terminals were initially going to be recommended in connection with Success software solution proposed to Engelfield, and Bletz was told if the sale went through, Maddy would receive the commissions on the MSI registers. Subsequently, Mr. Altizer called back on several occasions demanding that Success receive an ever-increasing share of the commissions on MSI products if a sale was made to Engelfield. Then, Mr. Tarlow canceled a follow up meeting with Engelfield at the last moment. Mr. Maddy was later told by the Tokheim representative that Mr. Tarlow had attempted to make arrangements to sell MSI registers directly to Engelfield, which Mr. Maddy construed as

an attempt by Mr. Tarlow to go behind his back and deprive Maddy of MSI sales commissions altogether.

During negotiations that led up to Maddy's decision to enter into the distributorship agreement with Success, Dennis Maddy was told that Success was in the process of pitching Black Gold, a long-time customer of Maddy, and Mr. Maddy was led to believe that Maddy would share in any commissions if a sale were made to Black Gold. When Mr. Maddy inquired how the Maddy account with Success would be credited for the Black Gold sale, he was informed by Success that the sale was made prior to the effective date of the distributor agreement and therefore Maddy was not entitled to receive any part of the commissions. Subsequently, Mr. Maddy was told by Kevin McLure of Black Gold that Success representatives had used Maddy's name to help sell a Success back office software system to Black Gold. Because Maddy's name was used to promote the sale, Mr. Maddy felt that the Claimant was entitled to a share of the commission. Success refused to give Maddy any part of the commission earned on the sale to Black Gold.

A sales presentation meeting had been scheduled for mid-February of 2001 between Jesse Altizer of Success, Ed Blest of Maddy and Brian Petit, the owner of Petit Oil Company. Mr. Altizer was more than an hour and a half late to the meeting and did not even have the courtesy of telephoning either Petit or Bletz. When Mr. Altizer finally showed up, he gave a very unprofessional presentation of the Success back office software product to the president of Petit Oil. At the end of the meeting when Mr. Petit stated that he did not know much more about the Success product than he did before the meeting, Mr. Altizer disagreed with him and became argumentative. After the

meeting, Mr. Bletz made numerous follow up phone calls to Mr. Petit who never returned his calls.

The Pettit incident was the proverbial last straw, and on February 28, 2001, Mr. Maddy mailed a letter to Mr. Tarlow giving 30-days notice of cancellation of the distributorship agreement "due to various misrepresentations, unprofessional business practices and an inability by [Success] to represent [its] product as promised." (9) Maddy's cancellation letter was sent certified mail and was received by Success on March 12, 2001.(9) On March 1, 2001, however, Mr. Tarlow learned from Mr. Altizer of Maddy's intention not to pay the balance of the initial inventory commitment fee and to cancel the distributor agreement. On March 1, 2001, Mr. Tarlow sent a letter via express mail to Mr. Maddy informing that he was in material breach for non-payment of initial inventory fee installments and that Success would terminate the contract for cause under paragraph 12 if the breach was not cured.

The contract was terminated on or about March 28, 2001 when the 30-day period set forth in Maddy's February 28th letter expired.

Prior to the termination of the Success distributorship agreement, Maddy had made quotes (proposals) for CMi back office software to five of its pre-existing customers, two of whom, namely, Hahn's and Brooker's Pit Stop purchased CMi software.(O) No evidence was adduced at the arbitration that Maddy did not offer Success software as well as CMi software to Brooker's and Hahn, nor was there any evidence that either of these customers would have purchased Success software. Based on the Respondent's counterclaims and pre-hearing brief, in apparent

10

recognition of the absence of evidentiary support, Success is not making any claim in connection with the sales of CMi back office software to Hahn or Brooker's.

Believing he was entitled to a refund of the $20,000 paid for initial inventory purchases as represented to him by Mr. Altizer, Mr. Maddy requested a refund of such fees in his letters of February 28 and March 14, 2001 (9, 20) and then in his attorney's letter of April 4, 2001. (27) Success refused to refund the $20,000.

By a letter dated April 6, 2001, Success demanded, pursuant to Section 11 of the distributorship agreement, that Maddy return all marketing aids and materials, including the Sales Resource Guide and CDs as well as a list of all "prospects." (11) By letter dated April 9, 2001, Maddy's attorney responded that Maddy was prepared to return the materials provided that Success refunded the $20,000 paid by Maddy as an advance for inventory purchases. (27)

On June 21, 2001, Maddy filed a claim for arbitration with the AAA seeking a refund of the $20,000 he had paid toward initial inventory purchases.

On July 10, 2001, Success filed an objection asserting that the claims raised by Maddy were not arbitrable. (2) On July 17, 2001, Success filed a four-count complaint in the District Court of Connecticut alleging claims for breach of paragraph 13 of the distributor agreement, breach of paragraph 15 of the distributor agreement, violation of the Connecticut Uniform Trade Secrets Act ("CUTSA") Conn. Gen. Stat. §35-50 *et seq*, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §42-110a *et seq*. (3) Notwithstanding allegations by Success of ongoing misappropriation by Maddy of its trade secrets, Success did not seek an immediate injunction against Maddy. Id.

On March 6, 2002, Maddy's attorney returned all sales materials in Maddy's possession to Success. (12) The letter confirmed that all Success software had been erased by Maddy from its hard drives back in the spring of 2001 when the distributor agreement wad been terminated and requested to be immediately notified if Success believed that all of the materials had not been returned. No such notice was ever sent by Success. However, at the arbitration hearing, Mr. Tarlow for the first time claimed that the Sales Tools compact disc was not the CD he had left in Mr. Bletz's possession. Mr. Bletz testified that the writing on the CD was his handwriting but believed it was the copy that was left with him by Mr. Tarlow during his training session. Mr. Bletz also testified that the two CDs that were returned to Success were the only ones in his possession. Mr. Tarlow stated if he were given an opportunity to rummage through the CMi offices, he felt he would find the original of the Success Systems Sales Tools CD. Mr. Tarlow admitted, however, that his belief in that regard was purely speculative and that he had no evidence to substantiate it. Mr. Bletz and Mr. Maddy unequivocally testified that they never disclosed the Success Sales Tool CD or any of its contents to anyone at CMi or to any other third party.

The federal action was stayed to allow the arbitrator to rule on the arbitrability issue. Subsequently, Success decided to litigate all claims, including its CUTSA and CUTPA claims, in arbitration. Approximately four months and three weeks after the Sales Resource Guide and all other Success materials had been returned, Success filed its answer and counterclaim in the arbitration proceeding. One of the counterclaims alleged a breach of contract for failure to return the materials that had already been returned.

When Success demanded the return of the Sales Resource Guide and other sales discs and materials, Ed Bletz gave all such materials to Mr. Maddy who placed them in a file cabinet in his office. The Success marketing materials remained in the file cabinet until March of 2002 when they were sent by Maddy to his attorney to be forwarded on to Success' counsel. The uncontroverted testimony of both Mr. Bletz and Mr. Maddy is that neither of them ever disclosed any of the Success materials or the contents thereof to CMi or to any other competitor of Success. Mr. Maddy and Mr. Bletz further testified that they never used any of the Success materials except prior to the February 28th letter of termination in connection with marketing and soliciting customers to buy Success products. The record is completely devoid of any direct or circumstantial evidence tending to show that Maddy or any agent of Maddy ever used or disclosed any allegedly confidential information to CMi or to anyone else.

Mr. Bletz testified that shortly after the distribution agreement was terminated, he was instructed by Mr. Maddy to create a list of Success "prospects." Bletz further testified that he hand wrote the names of approximately half a dozen companies, including Petit Oil, Engelfield Oil, Railway Express, and Newfield Oil, on a piece of legal sized paper and gave it to Mr. Maddy with the Success sales Resource Guide and other materials. Mr. Maddy believes that the loose sheet of paper on which the Success prospects were listed was sent with the Sales Resource Guide to his attorney in early March of 2002. No one has been able to find the missing list of prospects. Mr. Bletz testified that all of the customers listed as prospects were preexisting customers of Maddy.

Engelfield Oil Company is a large company with approximately 80 service station locations in Ohio. Engelfield was a longstanding customer of Maddy's prior to Maddy entering into a distributorship relationship with Success. Shortly after the Success distributorship agreement was signed, Ed Bletz was provided with copies of two Success multiple store's proposals made by Mr. Altizer to Engelfield. (14) Mr. Bletz accompanied Mr. Tarlow and Mr. Altizer to several meetings at Engelfield at which Success back office of software was presented and pitched to Engelfield. Jason Collins, who formerly worked for another back office software company named RSI, was responsible for evaluating software alternatives for Engelfield. At the initial meeting with Engelfield in November, Jason Collins mentioned at the beginning of the meeting that CMi was one of the back office software brands that Engelfield was looking into as a potential replacement for its RSI system.

Prior to entering into a relationship with Success, Maddy had explored a possible distributorship relationship with Advantage Energy Software (AES). By letter from AES dated August 31, 2000, Mr. Maddy became aware that Engelfield Oil was a prospect to purchase new back office software to replace its RSI systems after RSI had gone bankrupt. (V)

On May 7, 2001, several months after the Success contract was canceled, Ed Bletz spoke to Jason Collins by telephone and Mr. Collins told him that he had ruled out buying back office software from Success. Taking Mr. Collins at his word and believing that Success software was no longer an option for Engelfield, Mr. Bletz submitted a written proposal to Engelfield for CMi back office software. (B-23) The prices for CMi home office Price Book Manager software licenses and additional store licenses were