the standard CMi list prices for those products without any discount. (B-23) Bletz did not inform Rory Wall, then the president of CMi, about the quote he made to Engelfield on May 7, 2001. Bletz and Collins had no further conversations regarding the CMi proposal until July when Mr. Collins informed Mr. Bletz that Engelfield had decided to create its own program in-house.

The Success "completed activity report" summarizing contacts with Engelfield by Mr. Altizer and Mr. Tarlow shows that Altizer on behalf of Success quoted a price to Mr. Collins of $311,457 on April 6, 2001. (14 at SUC00003) The note entered by Mr. Tarlow on May 11, 2001 indicates that Collins told him he had been working with Rory Wall, then the president of CMi, and that CMi had come down a lot on price, but he was not impressed with Wall and liked Success. (Id.) The entry dated August 24, 2001 indicates that Mr. Engelfield has someone in-house who could do price book in three months. That entry is consistent with Mr. Bletz' testimony that he was told by Jason Collins around July of 2001 that Engelfield had decided to develop back office software in-house rather than purchasing software from any manufacturer. (Id.) It is undisputed that Engelfield did not purchase Success, CMi or any other software product, but instead developed its own system. Mr. Tarlow admitted he did not know how long Engelfield had been dealing with Mr. Wall of CMi. He also admitted he did not even know whether Mr. Wall had made a quote on behalf of CMi to Engelfield, let alone the price terms or timing of any such quote. Moreover, Mr. Tarlow acknowledged that he did not know the reasons for Engelfield's decision to create a software program in-house. Neither Mr. Collins nor anyone else from Engelfield Oil Company testified at the arbitration hearing.

15

Respondent's counterclaim alleges, "Upon information and belief, Success contends that Maddy interfered with and/or undermined Success' efforts to negotiate a contract with an entity known as Engelfield Oil Company (Engelfield), as Maddy made use of the Confidential Materials so as to eliminate any chances that Success had in obtaining this contract." Not one shred of evidence was presented to substantiate that allegation. (2 at pg. 5).

The mystery company identified in the respondent's counterclaim as "Company X" (2 at pg. 5) turned out to be Black Gold. Black Gold was a preexisting customer of Maddy's to whom Success had sold a back office software just prior to the effective date of the distribution agreement between Maddy and Success. Maddy did not participate in that sale. More than a year after the distributor agreement was terminated, Kevin McClure of Black Gold told Mr. Bletz that he was unhappy with his Success system he had purchased and wanted to know if Maddy marketed any other back office software systems. In 2000, when the Success sale was made, Black Gold was the owner operator of 5 locations. The inquiry made by Mr. McClure in 2001 was on behalf of a store that had an independent operator named Mike. Mr. Bletz told Mr. McClure that he would have to get back to him, and by the time he did so, Black Gold had already purchased another brand of back office software. Based on the undisputed evidence, Maddy never sold any CMi products to Black Gold or to any independent operator of any store owned by Black Gold. In fact, it is undisputed that Maddy never even made a quote for any CMi product to Black Gold.

Lastly, with respect to City Ice and Fuel, Mr. Tarlow admitted that he did not know why that company did not purchase a Success system. Nor was there any

16

evidence that Maddy said or did anything that influenced or might have influenced the decision by City Ice and Fuel not to purchase from Success.

**Maddy's Claim**

Maddy seeks a repayment of the $20,000 paid by it for the purchase of ten software licenses. Neither Exhibit A nor the addendum to the initial inventory purchase payment for ten re-sellable single user licenses contains any provision that such fees are non-refundable. The body of the distributorship agreement also does not speak to whether the "inventory commitment fee" is refundable upon cancellation of the agreement by the distributor. Section 11, entitled "Voluntary Termination" states in part,: "Provided the Agreement is terminated within the initial ninety (90) days of the Effective Date by the Licenser, all prepaid and unused Fees will be refunded to the Distributor." Section 11 does not state that prepaid inventory purchase fees are not refundable if the agreement is cancelled by the distributor. In fact, Section 11 does not even address the issue of the refundability of prepaid inventory fees in the event of termination by the distributor.

Respondent contends that the agreement should be construed to mean that the fees paid for initial inventory purchases of re-sellable licenses are not refundable except when the agreement is terminated by Success (the Licenser) within the first 90 days. The agreement does not state that. The distributor agreement was drafted by the Respondent and thus its provisions should be construed against the Respondent and in favor of the Claimant. See Hansen v. Ohio Casualty Ins. Co., 239 Conn. 537, 545 (1996). If Success' intent was that the amounts paid by the distributor for the initial

17

inventory purchase of re-sellable licenses was not refundable, Success should have said so in plain English. It did not.

Notwithstanding the rule of *contra proferentem*, if the distributorship agreement were construed by implication to mean that the initial inventory purchase amount was non-refundable except if the agreement was terminated by the Licenser within the initial 90 days, then the Respondent should have provided the claimant with the inventory purchased, namely, ten re-sellable single user ScannerWare licenses. Success has not only refused to refund the $20,000 paid by Maddy for the purchase of initial inventory of ten software licenses, Success has also refused to provide Maddy with the products it purchased. The argument made by Success that unlike some of its competitors including CMi it does not sell its licenses separately is specious. Since the Claimant paid for the licenses, it is entitled to receive the licenses, even if in order to re-sell them to customers, it has to also sell other components of the "solution" which Success would install. In short, Maddy paid for the software licenses and is entitled to receive the inventory it purchased. Since the Respondent refuses to deliver the inventory, the Claimant is contractually entitled to a refund of the $20,000 paid toward the initial inventory purchases.

If, as the Respondent contends, the agreement were construed to require Maddy to pay the $10,000 balance and for Success to keep the entire the $30,000 amount without having to give Maddy any product, then such payment would be an invalid liquidated damages clause that would constitute a penalty.

"In a valid contract action for liquidated damages the parties are permitted, in order to avoid the uncertainties and time-consuming effort involved, to estimate in

advance the reasonably probable foreseeable damages which would arise in the event of default." Norwalk Door Closer Co. v. Eagle Lock & Screw Co., 153 Conn. 681, 689 (1966). Under Connecticut law, in order for a liquidated damages clause to be enforceable, three conditions must be met: (1) that the damages are uncertain or difficult to prove; (2) that the parties intended to liquidate damages in advance; and (3) that the amount is reasonable because it is not greatly disproportionate to the amount of damages which the parties assumed at the time of their contract would be sustained if the contract were breached. New York Life Ins. Co. v. Hartford National Bank & Trust Co., 2 Conn. App. 279, 280 - 81 (1984). In this arbitration, none of those conditions is met. Certainly, the Claimant never intended to liquidate damages in advance.

The Respondent's unilateral attempt to treat the payments made by the Claimant for initial inventory purchases as a liquidated damages clause will not stand, and the Respondent breached the agreement by failing to refund the $20,000 paid toward the initial inventory purchase. Therefore, Claimant Maddy is entitled to $20,000, plus statutory interest and reasonable attorney's fees.

**Respondents Counterclaim's**

**1.    Non-Payment of Fees for Initial Inventory Purchase of Licenses.**

In its first counterclaim, Success contends that Maddy breached Section 11 and seeks recovery of the $10,000 balance in the initial inventory purchase of the $30,000 of re-sellable licenses of its manufactured products. That issue has been addressed above.

19

2. **Failure to Return Allegedly Confidential Marketing Materials.**

On March 6, 2002, more that four months prior to the date that the Respondent filed its counterclaim, Maddy returned the Success Sales Resource Guide and all other alleged confidential materials in its possession to the Respondent. Maddy's failure to return the Success Resource Guide upon termination of the agreement was excused by Success' breach in failing either to deliver the re-sellable licenses purchased or to refund Maddy the $20,000 in inventory commitment fees.

Even assuming *arguendo* that Maddy's breach was not excused, Success' counterclaim for failure to return the sales materials is moot because Maddy cured the breach by returning all of the materials prior to the date the counterclaim was filed. An issue is moot when the court or arbitrator can no longer grant any practical relief. See, Shays v. Local Grievance Committee, 197 Conn. 566, 571, 499 A.2d 1158 (1988); Spitz v. Spitz, 4 Conn.L.Rptr. 613 (1991) (plaintiff's claims for injunctive and other equitable relief were moot because the defendant had returned all of the plaintiff's files and documents); Vibert v. Atchley, 16 Conn.L.Rptr. 604 (1996) (counterclaim for failure to return personal effects rendered moot by their return).

Success was not damaged as a result of Maddy's delay in returning the Sales Resource Guide and CDs. Success may contend that it was damaged by expending attorney's fees in the federal lawsuit. If so, that contention fails for two reasons. First, attorney's fees are not compensatory damages. Second, filing a lawsuit alleging a claim for breach of Section 15 violated the provisions of the distributor agreement. Section 16 provides, "Except as set forth in Section 17 hereof, any claim, controversy or dispute arising between the parties with respect to this Agreement, to the maximum

20

extent permitted by law...shall be submitted to and resolved by arbitration" (A) Under Section 17, only claims for breach of Section 13 may be brought by filing a judicial action. Therefore, all other claims - including claims for breach of Sections 11 and 15 - are subject to the mandatory arbitration clause. By including a claim for breach of Section 15 "Return of Materials" in its court action, Success breached the arbitration provisions of Section 16 and for that reason is clearly not entitled to attorney's fees.

Insofar as the list of prospects is concerned, Section 11 calls for a list of all prospective or pending licenses but does not define what the term "prospective license" means. However, the requirement to provide a report on the status of negotiations pending with respect to such prospective licenses indicates that in order to be a "prospective license" for the purposes of Section 11, the distributor must have at least begun negotiations with a potential end-user for the purchase of a software license. Thus, to qualify as a "prospective license" within the meaning of Section 11, a potential end-user must have shown sufficient interest in Success software for the distributor to have quoted a price for the purchase of a license. Such a quote or proposal would constitute an offer and thus begin the negotiation process. The only formal quote by Maddy for a Success software license was to Railway Express. No evidence was adduced that Railway Express would have purchased a Success Systems solution if its name had been provided to Success back in March of 2000 when the distributor agreement terminated. As conceded by the Respondent at the arbitration, the identity of potential end users in connection with "prospective licenses" more than two and a half years ago is of no use to Success now. Therefore, injunctive relief is of no practical

value. Furthermore, Blest testified at the arbitration hearing to the best of his recollection as to the names that were on the over-inclusive list of prospects he created.

In sum, the Respondent did not sustain any monetary damage as a result of Maddy's delay in returning the materials and is not entitled to attorney's fees.

3. **Claimant Did Not Breach Section 13 of the Agreement Because It Did Not Use or Disclose and Alleged Trade Secret Information of Respondent.**

Paragraph 13 of the distributor agreement between the parties prohibits the Distributor from disclosing "trade secrets" of Licenser except as required to perform its duties for Licenser. As clarified by paragraph 13 of Altizer's agent agreement, for purposes of the distributorship agreement, a "trade secret" is defined by reference to the law. Under section 21, Connecticut law governs the agreement. Therefore, one must look to the definition of a "trade secret" under Connecticut law to determine how that term is defined for purposes of Section 13 of the Agreement. The definition of a "trade secret" under Connecticut law is found in Conn. Gen. Stat. §35-51(d) of the Connecticut Uniform Trade Secrets Act which provides in pertinent part:

> ... "trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The factors considered by Connecticut courts in determining whether given information is a trade secret include (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the

secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty of which the information could be properly acquired or duplicated by others." (citation omitted) <u>Nationwide Mutual Insurance Co. v. Stenger</u>, 695 F. Supp. 688, 691 (D. Conn. 1988).

Section 13 states that the specific examples of types of information that could qualify as trade secrets do not limit the generality of the legal definition of trade secrets, meaning that unless the specific information, such as product pricing information or prospective customer leads developed by the Licenser, meets the general definitional elements of Gen. Stat. § 35-51(d) to be a trade secret, it is not a trade secret.

Thus, the threshold issue is whether any of the information claimed by Success to be confidential constitutes a trade secret under Connecticut law. Customer lists are on the periphery of trade secret law and seldom qualify for protection as trade secrets. See, <u>Nationwide Mutual Ins. Co. v. Stenger</u>, 695 F.Supp. 688, 691 (D.Conn. 1988) (physical customer files containing customer names together with financial and family data, insurance history, current coverage, policy renewal dates and claims information not given trade secret status). In the instant arbitration, all of the "prospects" – including Engelfield Oil, Black Gold, and City Ice and Fuel – were customers of Maddy long before Success ever entered the picture. As such, none of them qualify as "prospective customer leads developed by Licenser." (1, ¶ 13) Englefield is a case in point. Engelfield is a major gasoline distributor in Ohio and has 82 different store locations. As such, it is a lead that could easily be ascertained by any back office software manufacturer. Moreover, not only was Englefield a longstanding customer of Maddy, in

23

August of 2000 prior to Maddy's association with Success, Dennis Maddy became aware from AES, another software manufacturer, that Englefield was a prospective customer lead for back office software.

Furthermore, even if all the prospects had not already been Maddy customers, typically only a small percentage of any potential customer base – in this instance service stations and convenience stores in Ohio – will turn out to be interested in purchasing any given product. No extraordinary effort would be required to locate prospects for back office software. Therefore, the names of prospects for back office software would not constitute trade secrets in any event.

None of the materials in the Success Sales Resource Guide appear to qualify as trade secrets, certainly not the company summary, marketing slicks or user manuals, which are either distributed to the public or readily ascertainable. The burden of proving that information is a trade secret lies on the person claiming entitlement to trade secret protection. Here, neither the contents of the product and services overview compact disc nor the contents of the sales tools disc have been sufficiently identified to ascertain whether they qualify as trade secrets. Furthermore, the Success compact discs and the user guides are copyrighted[2].

---

[2] Numerous federal cases have held that in certain instances state trade secret claims based on copyrighted computer programs are not preempted by the federal Copyright Act. For example, in Computer Asociates Intern, Inc. v. Altai, Inc., 982 F.2d 693, 716-721 (2d Cir. 1992), the Second Circuit held that state law trade secret claims alleging misappropriation of the contents of copyrighted computer programs are not preempted by 17 U.S.C. § 301 if an "extra element" is required that qualitatively changes the nature of the state law action so that it is different from a copyright infringement claim. Id. at 716-17. However, the Court in Altai emphasized that computer software incorporate ideas, processes and systems that are not protected by a copyright. "Precisely because trade secret doctrine protects the discovery of ideas, processes, and systems which are explicitly precluded from coverage under copyright law, courts and commentators alike consider it a necessary and integral part of intellectual property protection extended to computer programs." Id. at 717. The Court in Altai concluded

24

Success claims that the Sales Resource Guide and CD sales tools were a compilation. Each and every component of a compilation does not have to be a trade secret in and of itself. Elm City Cheese Co. v. Federico, 251 Conn. 59, 73 (1999). However, most of the portions of the Success Sales Resource Guide and CDs are disclosed to potential customers without confidentiality restrictions. Moreover, even if the contents of the Sales Resource Guide and sales CDs are not generally known or readily ascertainable by proper means, Gen. Stat. § 35-51(d)(1) also requires that the claimed trade secret derive independent economic value, actual or potential, from not being generally known to competitors. That statutory requirement is interpreted as a codification of the common law requirement that a trade secret must give its owner a competitive advantage. Id. at 88 n. 27. There was no evidence adduced that the sales and marketing materials to help sell Success back office software would be of any economic value to competitors such as CMi. The product is the software that consists of the actual programs and source codes. The marketing materials do not reveal anything meaningful about the inner makings of the software. The "keys to the commode" are embedded in the licensed software, not the sales and marketing materials of the Success Sales Resource Guide and CDs. Under the same reasoning advanced by the Respondent, one could argue that MicroSoft Windows features lists and Windows user's manuals provide the keys for its competitors to gain a competitive

---

that where the extra element was present such as where the use of copyrighted expression is simultaneously the violation of a duty of confidentiality under state law, a state claim for misappropriation of trade secrets was not preempted. All of the federal court decisions found by the Claimant which hold that state trade secret claims are not preempted by the Copyright Act involve computer programs; however, the same rationale would appear to apply to more traditional forms of literary materials as well.

advantage enabling them to modify their software to make it better than Windows. That argument is patently ridiculous.

Section 13 provides that Maddy "shall maintain in strict confidence, and shall not use or disclose except as required to perform its duties for [Success], all Trade Secrets of [Success]." Dennis Maddy and Ed Blest unequivocally testified that all the of materials claimed by Success to be trade secrets that were in the hard drive of Maddy's computers were erased and that the Sales Resource Guide and two CDs were stored in a cabinet in Mr. Maddy's office at or about the time that the distributor agreement was terminated. Mr.Maddy and Mr. Blest further testified that except in the performance of duties under the distributor agreement, none of the claimed trade secret information was ever used by Maddy. In addition, Mr. Maddy and Mr. Blest testified that neither they, nor to the best of their knowledge any other agent or employee of Maddy, ever disclosed any of the alleged confidential information to CMi or to any other third party. Not one shred of testimony or other evidence showed otherwise. The testimony of Mr. Maddy and Mr. Blest was uncontroverted. Not only did Success fail to meet its burden of proving any improper use or disclosure by the Claimant, the unrebutted evidence conclusively demonstrates that there was no misappropriation. Thus, regardless of whether any or all of the contents of the Sales Resource Guide or CDs constitute trade secrets, the Claimant did not breach Section 13.

The Respondent's claim that business leads provided by Success to Maddy were passed on to CMi also finds no support in the evidence. First, all of the so-called "leads", including Englefield Oil and Black Gold, were pre-existing customers of Maddy. Section 13 lists "prospective customer leads <u>developed by Licenser</u>" as trade secrets

26

and expressly states that "Trade Secrets do not include information Distributor possesses or acquires independently of Distributor's activities or duties as an [sic] Distributor of Licenser." (1) Since all of the leads/prospects were customers of Maddy prior to any distributorship agreement between Maddy and Success, none of them is a trade secret. Indeed, Maddy became a direct back office software distributor in order to sell such software to its customers, and Maddy's existing relationship with its customers conferred a potential advantage to Success.

The Respondent argues that Maddy customers who were identified by Success as being ones who might purchase back office software are leads developed by it. That is a false dichotomy. All of Maddy's customers were leads. Furthermore, Maddy knew which of its existing customers might have a current interest in back office software as shown by the fact that when Maddy mailed Success marketing pieces, it did so to targeted customers, not to all of its customers. Mr. Tarlow recognized the distinction between Maddy's pre-existing customers and new leads and prospects in his letter of March 1, 2001 to Dennis Maddy in which he wrote, "It would appear that Maddy has chosen not to take the initiative and pro-actively offer the product to <u>its local customers and potential prospects</u>.

Moreover, Success makes claims for damages with respect to three of Maddy's customers – Engelfield Oil, Black Gold and City Ice and Fuel – and the evidence is crystal clear that even if the term "lead" were construed in its most restrictive sense, none of those Maddy customers was a lead for back office software developed by Success. Engelfield Oil used a back office software system purchased from a company named RSI that went bankrupt. In August of 2000, Maddy learned that Engelfield was

27

a prospective customer lead for back office software because as a result of RSI going bankrupt, it needed to convert or replace its RSI software system. (V) That Mr. Maddy did not convey that information to Mr. Blest is irrelevant. The letter to Mr. Maddy from David Volin of Advantage Energy Software provides irrefutable written proof that the president of Maddy knew on or about August 31, 2001 that its customer Engelfield was a prospect to purchase back office software. (V) As such, Engelfield was not a prospective customer lead originated by Success. Of course, even if it had been, prior to submitting his CMi quote in May, Ed Blest had been told by Jason Collins of Engelfield that Success was no longer in the running and there is no evidence that Blest's quote had anything to do with Engelfield's decision to create a software solution in-house. It is undisputed that Engelfiled did not purchase CMi. In sum, Engelfield was not a lead from Success, and in addition, Success has not satisfied its burden of proof on the issues of causation or damages.

    Black Gold was not a prospective customer lead developed by Success while the distributor agreement was in effect. Success sold a back office software system to one Black Gold location in October 2000 before the effective date of the distributor agreement between Maddy and Success. Maddy did not participate in making that sale. Black Gold did not purchase Success software for any of its other five locations. Two and a half years later Black Gold, on behalf of an independent operator of one of its stores, approached Mr. Blest about the possibility of purchasing some other brand of back office software. Maddy did not immediately respond due to the pending arbitration with Success, and by the time Maddy got back to Black Gold about CMi, Black Gold had purchased software for the store in question from another software manufacturer.

Success' claim that Maddy interfered with its contractual and/or prospective business relationship with Black Gold is based on pure conjecture. Mr. Tarlow admitted that he had no evidence to substantiate that claim.

The same applies to City Ice and Fuel. Apparently, City Ice and Fuel decided not to buy a Success system. Mr. Tarlow said that negotiations for the sale of a Success system were proceeding cordially with a representative of City Ice and Fuel and then shortly after Maddy terminated the distributor agreement, the tone changed and the conversations ceased. Mr. Tarlow speculates that Maddy was the cause. No one from City Ice and Fuel was called to testify at the arbitration hearing. The claim involving City Ice and Fuel, like all of Success' counterclaims, is based completely on conjecture, with not one iota of evidence to support it.

### 4.     The Claimant Did Not Breach the "Best Efforts" Provision of Section 4.

The meaning of "best efforts" is largely relative and subjective. As Mr. Tarlow stated, the amount of time a given distributor spends on marketing Success products varies depending on a number of factors, including the market and the sales objective the particular distributor shoots for. In Mr. Tarlow's opinion, spending 5% of the time marketing Success products may be sufficient "best efforts."

Success concedes, as it must, that the distributor agreement with Maddy was not exclusive in that it did not prohibit or restrict Maddy's right to simultaneously represent and distribute brands that were competitive with Success products. Apparently, Mr. Tarlow erroneously believed at the time he entered into the agreement that Section 2 prevented Maddy from representing cross brands of back office software, but he was later advised by Success' new attorneys that Section 2 does not so provide. The

29