standard Success distributor agreement was subsequently modified by adding a provision making future distributorship arrangements with Success exclusive.

Since the distributor agreement with Maddy did not contain an exclusivity/non-compete clause, Maddy was free to distribute competing brands and did so. The "best efforts" to market and sell the products of Success language in Section 4 must be interpreted in light of the fact that the agreement was non-exclusive and Maddy simultaneously represented and distributed for CMi, a direct competitor of Success. In that context, Section 4 requires Maddy to use its best efforts to promote and sell Success products, recognizing that Maddy also has the right to and is distributing another competitive brand of back office software. The CMi distributor agreement, which was specifically modified at Maddy's request to delete the exclusivity/non-compete clause so that Maddy could represent competitive products, contains a best efforts provision similar to the one in Section 4 of the Success agreement.

Ed Blest credibly testified that except where a lead came from either Success or CMi, he presented both brands to potential customers, and if the customer showed enough interest he made a proposal for the brand the customer indicated it preferred or absent an expressed customer preference, the brand that best fit the particular customer's needs. Though competitive products, Success and CMi software had some different features and different strengths and weaknesses. Success software was more expensive than CMi software, a factor often important to potential buyers. In addition, Maddy installed the CMi systems whereas Success installed its systems. Local installation and service were important to some customers, particularly because Maddy

primarily marketed back office software to its own pre-existing customers who knew and trusted Maddy.

Success' argument that Maddy breached the best efforts clause is really a thinly disguised attempt to convert the non-exclusive distributor agreement into one that was exclusive to Success.

5. **Maddy Did Not Breach the Implied Covenant of Good Faith and Fair Dealing.**

The implied covenant of good will and fair dealing is a "rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. The principle, therefore, cannot be applied to achieve a result contrary to the clearly expressed terms of a contract..." Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 567 (1984). The implied covenants of good faith and fair dealing cannot be used to vary the express terms of the distributor agreement, and in this case, the claim for breach of the implied covenants of good faith and fair dealing is essentially coterminous with the claims for breach of express contract.

6. **The Claimant Did Not Violate the Connecticut Uniform Trade Secrets Act ("CUTSA").**

The Claimant did not misappropriate trade secrets in violation of the CUTSA for the same reasons that it did not breach the provisions of paragraph 13 of the distributor agreement. CUTSA prohibits misappropriation of trade secrets and defines misappropriation as the disclosure or use of a trade secret of another without consent. Conn. Gen. Stat. § 35-51(b)(2)(B)(ii). "Any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use."

31

Thus,...soliciting customers through the use of information that is a trade secret...constitute[s] 'use'. <u>On-Line Technologies, Inc. v. Perkin-Elmer, Corp.</u>, 253 F.Supp.2d 313, 323 (D.Conn.2003) citing Restatement (Third) Unfair Competition § 40 n. 22).

The unrebutted testimony of the Claimant's witnesses shows that Claimant Maddy did not solicit any customer utilizing any information claimed by Success to be confidential other than in furtherance of attempting to make potential sales of Success products while the distributor agreement was in effect. The uncontroverted evidence also establishes that Maddy did not otherwise exploit or attempt to exploit any alleged trade secret belonging to Success. As noted above, under Connecticut law a manufacturer's suggested retail price could never be a trade secret. However, even assuming for the purpose of argument that Succcess' suggested list prices were trade secrets, Ed Blest testified that the CMi list prices were set by CMi without any input from him and that all of the prices he quoted to potential customers for CMi products were at CMI's standard list prices. The exhibits corroborate his testimony, and the record is devoid of any conflicting evidence. The undisputed evidence conclusively shows that Maddy neither used nor disclosed any confidential information. The sales materials claimed by Success to be trade secrets remained in a drawer in a file cabinet in Maddy's office. Retaining such materials in a drawer without making use of them or disclosing any of their contents to any third party may have constituted a breach of Section 11 of the agreement, but retention without use or disclosure most certainly does not constitute misappropriation under the Uniform Trade Secret Act.

7. **The Claimant Did Not Violate the Connecticut Uniform Trade Practices Act ("CUTPA").**

To the extent that the Respondent's counterclaim for violation of CUTPA is predicated on an alleged misappropriation of trade secrets by the Claimant, Respondent's CUTPA claim also fails. The Claimant did not improperly disclose or use any trade secret of the Respondent.

Respondent Success also contends that Maddy's retention of the sales materials was a willful breach of the distribution agreement that violated CUTPA. Regardless of whether the breach was willful and unexcused, it did not violate CUTPA.

Conn. Gen. Stat. § 42-110b(a) provides "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Section 42-110a(4) defines "trade" and "commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value **in this state**. (emphasis added). Since Maddy never advertised or conducted any sales activities in Connecticut, Maddy did not violate § 42-110b of the Connecticut Unfair Trade Practices Act.

If notwithstanding the above, the Arbitrator addresses the merits of the CUTPA claim, the claim still fails. Unfair competition is not implicated because Maddy never improperly used or disclosed any of the alleged confidential materials to CMi or any other competitor of Success. Also, the deceptive acts language of the statute does not come into play. The issue is thus whether retention of the sales materials was an unfair act or practice within the meaning of CUTPA. It was not.

Section 42-110b(b) provides, "It is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 USC 45(a)(1),…" As noted by the Connecticut Supreme Court in A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 215-16, 517 A.2d 69 (1990), "[t]he federal Trade Commission has identified the 'four primary categories of practices which have been prohibited as unfair: (1) withholding material information; (2) making unsubstantiated advertising claims; (3) using high-pressure sales techniques; and (4) depriving consumers of various post-purchase remedies.' (citations omitted) As shown by these four main categories, unfair trade acts or practices are directed against consumers, not competitors. This comports with the legislative intent as revealed by CUTPA's legislative history. Representative Howar Newman, who reported the CUTPA legislation out of committee to the House of Representatives explained during the House floor debate, CUTPA "gives honest businessmen great protection [against] deceptive and unscrupulous [businessmen] who by unfair methods of competition and deceptive advertising, etc., unlawfully divert trade away from law abiding businessmen." 16 H.R., Proc., Pt. 14, 1973 Sess., p. 7323. Similarly, Stuart Dear, a member of the board of directors of the Connecticut Consumer Association said during the joint standing committee hearings that CUTPA would "assist the businessman in not losing out to those members of the business community who don't play fair" (citation omitted) See Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480, 497-98 (1995). Here, because the retained sales materials were not used by Maddy or disclosed to any third party during the period of their retention, Maddy's delay

in returning the sales materials to Success had no effect on trade at all. As such, it could not have been an unfair trade act or practice under CUTPA.

In determining whether a trade act or practice by a company conducting trade in Connecticut is unfair, court's apply the FTC's three-prong "cigarette rule": (1) whether the act offends public policy; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businessmen. A-G Foods, Inc. v. Pepperidge Farm, Inc., supra, 216 Conn. 215. All three criteria do not have to be present to support a finding of unfairness and a practice or act may be deemed unfair because of the degree to which it meets one criteria or because to a lesser degree it meets all three. Atlantic Richfield Co. v. Canaan Oil Co., 202 Conn. 234, 242 (1987). A vast majority of cases in Connecticut hold that a breach of contract, even if intentional, does not amount to a violation of CUTPA absent a showing of "substantial aggravating circumstances" beyond the breach itself. See, e.g., Profitel, Inc. v. FKI Industries, Inc., Judicial District of New Haven at New Haven, CV99-0427490 (Sept. 30, 199, Alander, J.) (commenting that 51 Superior Court decisions reviewed held that a simple albeit intentional breach of contract was insufficient to demonstrate a CUTPA violation); Emlee Equipment Leasing Corp. v. Waterbury Transmission, Inc., 41 Conn.Sup. 575, 580, 595 A.2d 951, 3 Conn.L.Rptr. 711 (Jan. 23, 1991) (Blue, J.).

In order to find "substantial aggravating circumstances, there must be evidence of a fraudulent or deceptive act or practice or of bad faith in procuring the original agreement. Raffone v. Home Depot U.S.A., Inc., Judicial District of New Haven at New Haven (June 23, 2003, Harper, J.) (No CUTPA violation alleged for breach of contract

35

and failure to remedy the breach where no allegation of any fraudulent or deceptive practice or bad faith in procuring the original contract); Emlee Equipment Leasing Corp., supra, 41 Conn.Sup. 580, 3 Conn.L.Rptr. 711 (same).

In <u>Pollock v. Punjabi</u>, 47 Conn.Sup. 179 (2000) a superior court found that an expert witness retained by the plaintiff committed unfair and deceptive acts in violation of CUTPA by destroying data to prevent the plaintiff from verifying the data and by threatening to withhold services and not to testify in court as an expert unless the plaintiffs first paid him additional monies not contractually agreed upon. That case is readily distinguishable because the destruction of the underlying data was deceptive and the demand was for extra-contractual monies. In the instant case, the retention of the sales materials was not deceptive and the "leverage" was created by a demand for a refund of money under the contract which the Claimant believed in good faith he was contractually entitled to. In <u>Pollock</u> the conduct that amounted to aggravating circumstances consisted of bad faith deceptive and unfair conduct outside the agreement which because it was beyond what the contract provided for also happened to be a breach of contract. Here, no deception or fraud was claimed or proved. Instead, the Respondent claims that Maddy acted in bad faith in not returning the materials as required by the agreement. However, there is no claim made or evidence that Maddy had no intention of performing under the distributor agreement with Success when the agreement was entered into. Since Maddy did not act in bad faith in procuring the distributor agreement, substantial aggravating circumstances amounting to fraud or deception are not present.

It is important to underscore that a bad faith breach will not suffice because that would convert virtually every intentional breach of contract between businessmen into a CUTPA claim. It is only bad faith in procuring the contract in the first place that constitutes aggravating circumstances. Furthermore, Maddy did not act in bad faith in not returning the allegedly confidential sales materials of Success. Only if Maddy knew or believed at the time that he was not entitled to the refund could his conduct in not returning the sales materials be deemed to be in bad faith. The evidence clearly shows not only that Maddy had a good faith belief he was entitled to a refund of the $20,000 prepaid for inventory but that he relied on the advice of counsel. In any event, as pointed out above, for bad faith acts to be aggravating circumstances to convert an intentional contract breach into a CUTPA violation, they must either be beyond the contract and not based on an interpretation of contract language as in Pollock or occur in connection with initially entering into the agreement, not the breach. Neither is present in this case.

Success also did not sustain a substantial injury due to the retention of the sales guide and other sales materials for slightly over a year. The materials were kept inside a file cabinet in Mr. Maddy's office and were not used or disclosed during that entire period. Success may claim that it was substantially injured because it was forced to file a federal lawsuit and expend attorney's fees in connection therewith to get its sales materials returned. However, that cannot be considered a substantial injury because the CUTPA claim was baseless and Success' sole remedy for breach of Sections 6 and 11 under Section 16 was arbitration. By pursuing those claims in a judicial action, the Respondent breached the contractual arbitration clause.

8. **The Respondent is Not Entitled to an Award of Attorney's Fees Under Section 17.**

In case the Arbitrator reaches the issue of whether the Respondent is entitled attorney's fees, the Claimant will address that issue. Section 17 allows the Licenser to bring a court action for damages or injunctive relief "in the event of a breach by Distributor of Section 13." (A) Section 13 states, "Should Licenser have any basis to seek such legal or equitable action, Distributor shall pay any and all attorney fees and court costs incurred that Licenser may incur." Section 13 contemplates a court action and the language regarding an award of attorney's fees and court costs applies only to a court action, not an arbitration. If Success had chosen to pursue its breach of section 13 claims in the federal court action, the court could have awarded attorney's fees to Success if it prevailed. However, Section 13 does not authorize or empower an arbitrator to award attorney's fees or court costs. The authority of an arbitrator to award attorney's fees is governed by Section 20, not Section 13. Such an interpretation is consistent with the rule that ambiguities in a contract language are construed against the drafter – in his case against the Respondent.

Even if an arbitrator had the power under Section 13 to award attorney's fees, none should be awarded here because the Claimant did not breach Section 13. The Respondent claims that the words "Should Licenser have any basis to seek such legal or equitable action" in the attorney's fees provision of Section 13 should be construed to mean that Success is entitled to an award of attorney's fees even if it fails to prove any breach of Section 13 and does not prevail on any part of its claim for breach of Section 13. In effect, the Respondent's argument is that it is entitled to attorney's fees even if its claims are baseless. The Respondent's interpretation borders on absurd. The phrase

38

"any basis to seek" must be read in the context of the rest of Section 13 including the preceding language indicating that the Licenser can only bring a legal action "in the event of a breach of Section 13" and "in the event any such breach." Section 13 does not say in the event of an "alleged breach" or a "claimed breach", but simply in the event of a breach. No breach; no attorney's fees. Moreover, the ambiguity must be construed against Success who drafted the agreement. The attorney's fees provision in section 13 should be interpreted to mean that that if the Respondent prevails on any one of a number of different claims for breach of Section 13, it should only recover attorney's fees incurred in connection with the successful claim. Otherwise, a party could bring a number of baseless claims and one meritorious claim for breach of Section 13 but recover attorney's fees incurred in connection with the baseless claims. Such a result would be manifestly unjust and unfair and would violate public policy.

Furthermore, Success did not have any evidentiary basis for even bringing a claim for breach of the confidentiality provisions of Section 13. Mr. Tarlow felt that since the Claimant would go to the length of retaining the Success marketing materials as leverage to get its money back, he was "concerned" that the Respondent would not respect the confidentiality of such materials. According to Mr. Tarlow, this "concern" arose when it came to his attention that Maddy was also representing CMi.

First of all, there was no evidence then and there is no evidence now that Maddy ever disclosed any of the contents of the Success marketing materials or price list to CMi or anyone else. Nor has there ever been a shred of evidence that Maddy ever improperly used any of such information. Not only was Mr. Tarlow's "concern" based on sheer speculation and conjecture, it arose as a direct result of Mr. Tarlow's mistaken

belief that under the distributor agreement, Maddy was an exclusive distributor of Success products and could not cross market any other brand of back office software. Mr. Tarlow stated that exclusivity clauses were standard in the computer software industry but admitted that although he incorrectly believed otherwise at the time, the distributor agreement between Success and Maddy did not contain an exclusivity clause. Even if exclusivity clauses are standard in the computer software industry as maintained by Mr. Tarlow, there is no evidence that Maddy was aware of that. In fact, based on the fact that there was no exclusivity provision in the Success agreement and CMi had removed such a provision for its distributor agreement, Mr. Maddy was led to believe just the opposite. In any case, since there was no exclusivity/non-compete clause in the agreements, Maddy was free to cross market other brands of software and did so. Maddy did not know that there was past bad blood between Success and CMi nor that they were, at least to Mr. Tarlow, fierce competitors.

  The concern of Mr. Tarlow that the Claimant might disclose allegedly confidential trade secret information was directly attributable to the Respondent's failure to include an exclusivity provision in its distributor agreement with the Claimant which in turn led Mr. Tarlow to imagine all sorts of dire and nefarious things when he learned post termination that Maddy had been and continued to represent CMi. Not only did Success not have any factual basis for instituting its claim for breach of Section 13, Success' conjecture was the result of its own mistake. Pure speculation based on "concerns" can never be a legitimate basis for making a claim, absent some evidence that supports the allegations made. Even if the Arbitrator were somehow to adopt the draconian interpretation urged by the Respondent of the attorney's fees provision in

section 13, the Arbitrator should exercise his sound discretion by denying an award of attorney fees under the circumstances of this case.

9. **The Respondent is Not Entitled to Attorney's Fees Under Section 20.**

Section 20 provides "Distributor shall indemnify Licenser fully for any cost, liability or harm suffered by Licenser, including reasonable attorney's fees, as a direct or indirect result of Distributor's breach of any of the terms of this Agreement." (A) The Claimant's position is that it did not breach the distributor agreement except in failing to return the alleged confidential sales materials and that said breach was excused by the Respondent's prior breach in failing and refusing to refund the prepaid inventory fee or deliver the pre-purchased licenses. If the failure to return the sales materials is found to be an unexcused breach, then the breach was cured prior to the date the Respondent filed its counterclaim by the materials being returned to Success.

The Respondent is not entitled to recover any attorney's fees in connection with its prior federal lawsuit for breach of Sections 11 or 15 for the delay in returning its marketing materials because pursuant to Section 16 those claims had to be "submitted to and resolved by arbitration." By including in the court action claims for breach of contract for Maddy's failure to return the materials, the Respondent was itself in breach. Accordingly, the Respondent is not entitled to an award of attorney's fees under Section 20.

Should the Arbitrator find that the Claimant breached any terms of the agreement and that an award of attorney's fees to the Respondent is appropriate, then only reasonable attorney's fees resulting from the breach should be awarded. No amounts of attorney's fees should be awarded for the federal court action or for settlement

negotiations. Also the any amount of attorney's fees awarded should bear a reasonable relationship to the Respondent's actual damages. It is well established that arbitrators have broad discretion in determining whether to award reasonable attorney's fees and the amount of any such award. If an award of attorney's fees is made to the Respondent, it should be minimal.

## 10. The Respondent is Not Entitled to Punitive Damages.

Under Section 17, punitive damages may only be awarded for violations of Sections 13 and 14. Here, there was no violation of either of those sections.

## Conclusion

For all of the foregoing reasons, Claimant Maddy Petroleum Equipment, Inc. respectfully requests that an award be rendered in its favor on its claim for a refund of the $20,000 pre-paid for licenses plus such interest and attorney's fees as the Arbitrator deems just and reasonable. The Claimant further requests that all of the Respondent's counterclaims be denied.

Respectfully submitted on
Behalf of the Claimant
Maddy Petroleum Equipment, Inc.

By: _____
Warren L. Holcomb, Esq.
Berchem, Moses & Devlin P.C.
75 Broad Street
Milford, Connecticut 06460
Telephone (203) 783-1200
Facsimile (203) 882-0045

## CERTIFICATION

This is to certify that a copy of the foregoing Claimant's Post-Hearing Brief was sent on this 18rd day of October, 2003 by U.S. mail first class, postage prepaid to the following:

Kerri Morrone
Case Manager
American Arbitration Association
950 Warern Avenue
East Providence, RI  02914


Joseph M. Pastore, Esq.
Thomas J. Lengyel, Esq.
Brown, Raysman, Millstein, Felder & Steiner
Cityplace II, 185 Asylum Street
Hartford, CT  06103
(860) 275-6410

_____
Warren L. Holcomb

## BERCHEM, MOSES & DEVLIN, P.C.

ROBERT L. BERCHEM
MARSHA BELMAN MOSES
MICHAEL P. DEVLIN†
STEPHEN W. STUDER*
RICHARD J. BUTURLA
FLOYD J. DUGAS
KENNETH R. PLUMB
LAWRENCE B. PELLEGRINO

JONATHAN D. BERCHEM*
CAROLYN MAZANEC DUGAS
WARREN L. HOLCOMB◊
MICHELLE C. LAUBIN†
BRYAN L. LECLERC†
BRIAN A. LEMA
DEAN R. SINGEWALD, ⅹ
BRIAN W. SMITH
MICHAEL V. VOCALINA

ATTORNEYS AND COUNSELORS AT LAW
75 BROAD STREET
MILFORD, CONNECTICUT 06460

TELEPHONE (203) 783-1200
FACSIMILE (203) 878-2235
(203) 877-8422

OF COUNSEL
THOMAS GALVIN COTTER
MARK J. ROSEN

NEW HAVEN OFFICE
91 WILLIAM STREET
NEW HAVEN, CONNECTICUT 06511

PLEASE REPLY TO:
MILFORD OFFICE

*ALSO ADMITTED IN CALIFORNIA
*ALSO ADMITTED IN MASSACHUSETTS
†ALSO ADMITTED IN NEW YORK
◊ALSO ADMITTED IN PENNSYLVANIA

March 6, 2002                                                                     via federal express

Joseph M. Pastore, III
Brown, Raysman, Millstein, Felder
 & Steiner LLP
CityPlace II
185 Asylum Street
Hartford, CT 06103

Re:   Your client:   Success Systems, Inc.
      My client:     Maddy Petroleum Equipment, Inc.

Dear Joe:

As I promised at the mediation session, enclosed is the Sales Resource Guide & Products Summary notebook effective August 1, 2000, the CDs entitled "Product Suite 2000 Product & Services Overview and Success Systems Sales Tools" and the product video that were in the possession of my client. Also enclosed are Scanner Ware sales brochures and one sheets.

Mr. Maddy has assured me that all Success Systems licensed software was erased from the hard drives of Maddy Petroleum Equipment, Inc. long ago.

I inventoried the enclosed materials and made a copy of the Sales Resource Guide notebook. Without prejudice to my client's position that the guide does not contain confidential trade secret information, I will treat my copy of the guide as being subject to a confidentiality agreement in that its contents will not be disclosed to any third party except in connection with the pending arbitration or lawsuit and then only if the third party agrees in writing to similarly maintain its confidentiality.

18820-1

My client assures me that he does not have any other Success Systems items or materials in his possession. If you believe otherwise, please advise me immediately.

Very truly yours,

Warren L. Holcomb

WLH/jmc
enclosures

cc: Dennis Maddy
Richard J. Buturla, Esq.
Lawrence B. Pellegrino, Esq.

18820-1

SUC00157